Helen SEMLER, Administratrix of the
Estate of Natalia Semler,
Deceased, Appellant,

v.

PSYCHIATRIC INSTITUTE OF WASH-
INGTON, D. C., INC., et al.

Helen SEMLER, Administratrix of the
Estate of Natalia Semler, Deceased,

v.

PSYCHIATRIC INSTITUTE OF
WASHINGTON, D. C., INC., et
al., Appellants.

Nos. 76–2056 and 76–2059.

United States Court of Appeals,
District of Columbia Circuit.

Argued 1 Dec. 1977.

Decided 28 March 1978.

Robert W. Lewis, Washington, D. C., for Helen Semler, Administratrix of the Estate of Natalia Semler, deceased.

Quentin R. Corrie, Annandale, Va., of the bar of the Supreme Court of Virginia, pro hac vice, by special leave of Court, for appellee. Anthony F. Troy, Atty. Gen. of Virginia, Stuart H. Dunn, Deputy Atty. Gen. and Henry M. Massie, Jr., Asst. Atty. Gen., Richmond, Va., were on the brief, for appellee, Paul Folliard. Darryl L. Wyland, Falls Church, Va., was on the brief, for appellee.

Before WRIGHT, McGOWAN and WIL-KEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

WILKEY, Circuit Judge:

The issue presented in this case is whether a Virginia judgment for plaintiff under the Virginia Wrongful Death Act[1] precludes plaintiff from seeking further recovery in a District of Columbia court for the same wrongful death under the District of Columbia Wrongful Death Act[2] and Survival Act.[3]

In 1972 John Gilreath was convicted in a Virginia state court for the abduction of a young girl. The judge sentenced Gilreath to 20 years' imprisonment but suspended the sentence, conditioned on his continued treatment and confinement at the Psychiatric Institute of Washington, D.C.[4] In September 1973, without the approval of the Virginia court but with the sanction of Gilreath's probation officer, the Psychiatric Institute placed Gilreath in a loosely structured and generally unsupervised out-patient program. The following month Gilreath murdered a young woman, Natalia Semler, in Fairfax, Virginia.

Helen Semler, the deceased's mother and personal representative, brought an action under the Virginia Wrongful Death Act in the United States District Court for the Eastern District of Virginia[5] against the

---

1. Code of Virginia (1950), as amended, § 8–633 et seq. (current version at § 8.01–50 et seq.)

2. D.C.Code § 16–2701 et seq. (1973).

3. D.C.Code § 12–101 et seq. (1973).

4. The Institute is located within the District of Columbia.

5. Jurisdiction was founded upon diversity of citizenship. 28 U.S.C. § 1332.

Psychiatric Institute and other defendants associated with the Institute, contending that defendants had been negligent in their supervision and control of Gilreath and that this negligence proximately caused the death of plaintiff's daughter. On 17 October 1974 the district court, sitting without a jury, found the defendants liable and on 18 October entered judgment for $25,000.

One week later, on 25 October 1974, plaintiff filed the instant action against the same defendants under the District of Columbia Wrongful Death Act and Survival Act in the United States District Court for the District of Columbia.

On 29 September 1976 the District Judge issued an order[6] granting defendants' motion for summary judgment on the ground that plaintiff's District of Columbia action was precluded by the *res judicata* effect of the judgment plaintiff had already obtained in the previous Virginia action. The case is before us on plaintiff's appeal from this order. For the reasons stated herein, we affirm the District Court.

## I. ANALYTIC OVERVIEW

■ This wrongful death case involves two jurisdictions—the state of Virginia and the District of Columbia. These jurisdictions follow different choice of law rules. The choice of law rule for wrongful death followed by Virginia courts is that the law of the place of the wrong determines the

existence and nature of a cause of action for death, unless another state has a more significant relationship to the occurrence or the parties with respect to a particular issue.[7] The "place of the wrong" is defined as "the place the harmful force takes effect upon the body."[8] In contrast, the District of Columbia has increasingly applied an "interest analysis" approach in determining the law applicable in tort cases in general[9] and wrongful death cases in particular.[10] Simply stated, the method of governmental interest analysis is (1) to identify the state policies underlying each law in conflict, and (2) to decide which state's policy would be advanced by having its law applied to the facts at bar.[11]

Moreover, the substantive laws governing wrongful death in Virginia and the District of Columbia are different. At common law no civil action was maintainable in either jurisdiction against a person for the wrongful death of another. A right of action for personal injuries did not survive the death of the injured party. Both jurisdictions have now changed this rule by statute.

■ Under District of Columbia law, negligent conduct resulting in death gives rise to *two independent rights of action,* one under the Wrongful Death Act and one under the Survival Act, upon each of which damages may be sought.[12] The Wrongful Death Act is said to create an entirely *new right of action* in favor of designated beneficiaries.[13] It is designed to provide a reme-

---

**6.** The unpublished memorandum order is reproduced at Joint Appendix (J.A.) 29–33.

**7.** *McClure v. U. S. Lines Co.,* 368 F.2d 197 (4th Cir. 1966). *See Betts v. Southern Ry. Co.,* 71 F.2d 787 (4th Cir. 1934); *Holt v. Middlebrook,* 119 F.Supp. 295 (E.D.Va.1954), *aff'd* 214 F.2d 187 (4th Cir. 1954); *Dowell v. Cox,* 108 Va. 460, 62 S.E. 272 (1908).

**8.** Restatement, Conflict of Laws § 377, note 1 (1934).

**9.** *See, e. g., Gaither v. Myers,* 131 U.S.App.D.C. 216, 404 F.2d 216 (1968); *Roscoe v. Roscoe,* 126 U.S.App.D.C. 317, 379 F.2d 94 (1967); *Williams v. Rawlings Truck Line, Inc.,* 123 U.S. App.D.C. 121, 357 F.2d 581 (1965). *See generally,* Milhollin, The New Choice of Law in the District of Columbia, 24 Catholic U.L.Rev. 488 (1975).

**10.** *See Tramontana v. S.A. Empresa De Viacao Aerea Rio Grandense,* 121 U.S.App.D.C. 338, 350 F.2d 468 (1965).

**11.** *See generally* Crampton, Currie, Kay, Conflict of Laws: Cases, Comments, Questions (1975) at 206–296.

**12.** *Runyon v. District of Columbia,* 150 U.S. App.D.C. 228, 463 F.2d 1319 (1972); *Emmett v. Eastern Dispensary & Casualty Hosp.,* 130 U.S. App.D.C. 50, 396 F.2d 931 (1967).

**13.** *Runyon v. District of Columbia,* 150 U.S. App.D.C. 228, 463 F.2d 1319 (1972); *Jones v. Pledger,* 124 U.S.App.D.C. 254, 363 F.2d 986 (1966).

dy whereby close relatives of the deceased, who might naturally have expected maintenance or assistance from the deceased had he lived, may recover compensation from the wrongdoer commensurate with the loss sustained. Thus, proper recovery under this Act is based on the pecuniary benefits that the statutory beneficiaries might reasonably be expected to have derived from the deceased had he lived.[14]

The Survival Act, on the other hand, does not create a new right of action for designated beneficiaries, but rather preserves and carries forward for the benefit of the deceased's estate the right of action which the deceased would have had, had he not died.[15] The Act is designed to place the deceased's estate in the position it would have been in had the deceased's life not been cut short. Thus, proper recovery under the Act is based on the probable net future earnings reduced by the amount deceased would have used to maintain himself and those entitled to recover under the Wrongful Death Act.[16]

Virginia, in contrast, provides only *one exclusive* right of action in wrongful death cases. The Virginia Wrongful Death Act, like its District of Columbia counterpart, creates in the deceased's personal representative a *new* right of action for the benefit of certain designated beneficiaries.[17] At the time of deceased's death, it provided for recovery up to $25,000 exclusively for solace and up to $50,000 for financial loss sustained by deceased's dependents. It is clear under Virginia law that this statutory provision is intended to be the *exclusive* basis of recovery for wrongful death, and it exists *in lieu* of an action based on the survival of the deceased's original claim.[18] In *Wilson v. Whittaker*[19] the Supreme Court of Virginia described the nature of this single and exclusive right of action:

When a person is injured by the wrongful act of another and dies, the cause of action in the suit by his personal representative for death by wrongful act remains the same as that for his personal injuries. But the right of action for personal injuries does not survive the decedent. A new right of action is given decedent's personal representative only through the grace of legislative enactment.

We have held that in an action for wrongful death the personal representative of the deceased sues primarily as trustee for certain statutory beneficiaries and not for the general benefit of the decedent's estate. The object of the statute is to compensate these beneficiaries for their loss occasioned by the decedent's death.[20]

It is the policy and purpose of Virginia under this Act *not* to allow two actions in favor of the personal representative, one representing the estate and the other the beneficiaries, against the same defendant for the same wrong. Although Virginia does have a general survival statute,[21] the statute does not apply to wrongful death claims[22] and, hence, the survival statute

---

14. *Runyon v. District of Columbia,* 150 U.S. App.D.C. 228, 463 F.2d 1319 (1972).

15. *Jones v. Rogers Memorial Hosp.,* 143 U.S. App.D.C. 51, 442 F.2d 773 (1971).

16. *Runyon v. District of Columbia,* 150 U.S. App.D.C. 228, 463 F.2d 1319 (1972).

17. *Grady v. Irvine,* 254 F.2d 224 (4th Cir.) *cert. denied,* 358 U.S. 819, 79 S.Ct. 30, 3 L.Ed.2d 60 (1958); *Wilson v. Whittaker,* 207 Va. 1032, 154 S.E.2d 124 (1967); *Anderson v. Hygeia Hotel Co.,* 92 Va. 687, 24 S.E. 269 (1896).

18. *See Brammer's Adm'r v. Norfolk & W. Ry.,* 107 Va. 206, 57 S.E. 593 (1907). *See also Grady v. Irvine,* 254 F.2d 224 (4th Cir. 1958); *Payne v. Piedmont Aviation, Inc.,* 294 F.Supp. 216 (E.D.Va.1968); *Bagley v. Weaver,* 211 Va. 779, 180 S.E.2d 686 (1971); *Anderson v. Hygeia Hotel Co.,* 92 Va. 687, 24 S.E. 269 (1896).

19. 207 Va. 1032, 154 S.E.2d 124 (1967).

20. 154 S.E.2d at 127–28.

21. Code of Virginia (1950), as amended, § 8–628.1 (current version at § 8.01–25).

22. *See Grady v. Irvine,* 254 F.2d 224 (4th Cir. 1958); *Brammer's Adm'r v. Norfolk & W. Ry.,* 107 Va. 206, 57 S.E. 593 (1907). See also Code of Virginia (1950) § 8–640 (abatement and revival) (current version at § 8.01–56).

*does not provide* an additional basis of recovery for wrongful death. Indeed, the availability of the wrongful death remedy in Virginia is predicated upon the non-availability of the survival remedy.[23]

In the instant case, the deceased was killed *within* the state of Virginia; the fatal force was administered *within* the state. The deceased was a Virginia resident, and plaintiff is a Virginia resident. However, defendants are residents of the District of Columbia, and their negligent supervision of the Virginia convict occurred *within* the District of Columbia. Plaintiff asserts that *under these circumstances* a Virginia court, using its modified "place of the wrong" approach, would apply *Virginia substantive law* in a wrongful death action, whereas a District of Columbia court, using "interest analysis", would apply *District of Columbia substantive law.* It is true that a Virginia court would apply Virginia law in this case; however, it is questionable that "interest analysis" would result in the application of District of Columbia law in a District of Columbia court.[24] Nevertheless, for the purpose of argument, we will assume without deciding that a District of Columbia court would apply District law if the case was brought *initially* in the District.

Because wrongful death actions are *transitory* in nature, plaintiff in this case had the option of bringing an action in any court having subject matter jurisdiction and personal jurisdiction over the defendants, which here would encompass the state and federal courts in Virginia and the District of Columbia.

Had plaintiff *initially* brought suit in a local or federal District of Columbia court, then that court would have been free to apply District of Columbia law to the case,[25] and, if it had, plaintiff would have been entitled to the recovery she presently seeks under the District's Wrongful Death Act and Survival Act. Plaintiff did not do this,

however. Instead, she brought an action in federal court in Virginia specifically under the Virginia Wrongful Death Act. Thus, plaintiff herself urged the application of *Virginia law* rather than District law to the case. The federal trial court in Virginia, sitting as it was in a diversity action, was obliged to apply the choice of law rules of the forum state.[26] As already stated, the Virginia choice of law rule in a wrongful death case is that the law of the place where the fatal force impacts upon the body governs the rights and liabilities of the parties *unless* it is determined that another jurisdiction has a more significant relationship to the occurrence, in which case the law of that jurisdiction may be applied. Applying this rule to the case at hand, the Virginia federal court determined that Virginia substantive law defined the nature and scope of plaintiff's rights. Plaintiff pursued this action to conclusion, obtaining a final judgment of $25,000 under Virginia law.

Having pursued the Virginia action to final judgment, plaintiff seeks to bring a new suit in the District of Columbia premised on the application of District of Columbia law. The suit is based on precisely the same grouping of operative facts as the Virginia suit was based. Meeting a plea of *res judicata,* plaintiff contends that her cause of action under District law is different from the cause of action already adjudicated under Virginia law. At this stage plaintiff abandons her claim to recovery under the District's Wrongful Death Act and presses her right to recover *under the District's Survival Act* on the theory that the Survival Act differs from the Virginia Wrongful Death Act in that it is conceptually designed to redress the interests of the deceased's estate, whereas the Virginia Wrongful Death Act is intended to

---

23. *See* cases cited at note 18, *supra.*

24. *Cf. Hurtado v. The Superior Court,* 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (1974).

25. *See Alaska Packers Ass'n v. Industrial Accident Comm'n,* 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed.2d 1044 (1935).

26. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

redress the interests of designated beneficiaries.[27]

The issue thus presented is whether the Virginia judgment under the Virginia Wrongful Death Act precludes further recovery under the District of Columbia Survival Act.

## II. DISCUSSION

■ The doctrine of res judicata, judicial in origin, was established primarily to avoid repetitive litigation of the same issues and causes of action and thereby to (1) minimize the judicial energy devoted to individual cases, (2) establish certainty and respect for court judgments, and (3) protect the party relying on the prior adjudication from vexatious litigation. Under the doctrine, once a claim or cause of action has been presented for adjudication and a valid and final judgment on the merits has been rendered, the same claim or cause of action cannot be asserted in a subsequent suit.[28] Where the final judgment is rendered in favor of the plaintiff, the cause of action merges into the judgment, and plaintiff may not thereafter maintain another suit on the same cause of action. Where a final judgment is rendered in favor of the defendant, plaintiff is barred from suing defendant on the same cause of action. These principles of "merger" and "bar" are the claim preclusion aspects of the res judicata doctrine.[29]

■ The Full Faith and Credit Clause, Article IV, § 1 of the Constitution of the United States provides:

Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

This clause renders compulsory as between the States the common law doctrine of res judicata.[30] It requires the courts of each state to give to the judgments of other states the same conclusive effect between the parties as is given such judgments in the states in which they were rendered. A judgment for the plaintiff in a court of a sister state merges the original cause of action and precludes a new suit thereon to the same extent as this judgment would preclude another suit in the same state. Thus, under the Full Faith and Credit Clause, the preclusive effect of a judgment must be determined by the law of the state where it was rendered.[31]

■ The constitutional requirement refers only to the obligation of state courts to give full faith and credit to the judgment of other state courts. However, we believe that the principles of Erie R. Co. v. Tompkins[32] and the mandate of the Full Faith and Credit Clause as supplemented by 28 U.S.C. § 1738 require a federal court exercising diversity jurisdiction in forum II to give to the judgment of a federal court exercising diversity jurisdiction in forum I the same full faith and credit that a state court in forum II would be obliged to give the judgment of a state court in forum I, at

27. The theoretical distinction between the interests of the estate and the interests of statutorily designated beneficiaries is not a practical distinction in this case because the identities of the beneficiaries of the estate and the designated beneficiaries are the same. Thus, the prospective beneficiaries in the instant suit were represented in the Virginia suit.

28. See generally Restatement, Judgments, Chapter 3 (1942); Restatement Second, Judgments (Tent. Draft No. 1, 1973); James, Civil Procedure c. 11 (1977 ed.); Vestal, Res Judicata/Preclusion (1969).

29. The principles of "direct estoppel" and "collateral estoppel" are the issue preclusion aspects of the doctrine of res judicata. Accord

ing to these principles, an issue essential to the judgment rendered, which was actually litigated and determined by a court having jurisdiction, may not be relitigated by the parties.

30. E. g., Hampton v. McConnel, 16 U.S. 234, 4 L.Ed. 378 (1818); Magnolia Petroleum Co. v. Hunt, 320 U.S. 430, 64 S.Ct. 208, 88 L.Ed. 150 (1943); Yarborough v. Yarborough, 290 U.S. 202, 54 S.Ct. 181, 78 L.Ed. 269 (1933).

31. Restatement Second, Conflict of Laws § 95 (1971). See cases cited at note 30, supra.

32. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

*least* in the absence of an overriding federal interest.[33]

In *Magnolia Petroleum Co. v. Hunt*[34] the Supreme Court confronted a situation very much like the one presented in the case at bar. An employee of a Louisiana-based oil company was injured in the course of his employment while working in Texas. He sought and procured in Texas an award of compensation for his injury under the Texas workmen's compensation law. The oil company's insurer made payments of compensation as required by the statute and the award. The employee then brought an action in a Louisiana court to recover further compensation for his injury under the Louisiana workmen's compensation law. The oil company filed exceptions on the ground that the recovery sought was precluded by the merger effect of the Texas judgment which, by virtue of the constitutional command, was entitled in the Louisiana courts to full faith and credit. The Louisiana court overruled the exception and entered judgment for the employee for the amount of compensation fixed by the Louisiana statute, after deducting the amount of the Texas payment. The judgment was affirmed by the Louisiana Court of Appeals and certiorari was denied by the Louisiana Supreme Court. The United States Supreme Court reversed, holding that, under the Full Faith and Credit Clause, the Texas award precluded further recovery under Louisiana law:[35]

[W]hen the employee who has recovered compensation for his injury in one state seeks a second recovery in another he may be met by the plea that full faith and credit requires that his demand, which has become res judicata in one state, must be recognized as such in every other.

The employee in *Magnolia Petroleum* contended that his Louisiana suit was on a "different cause of action" and hence was not precluded by the Texas award. The Supreme Court rejected this argument, noting that the preclusive effect of the Texas judgment was to be determined by reference to Texas law and that consequently the issue of identity of causes of action was governed by that law.[36] The Court determined that the Louisiana suit was based on the same cause of action as had been raised in the Texas suit.[37] The Court based this determination on two factors. First, it noted that both suits were based on precisely the *same factual predicate* or grouping of operative facts, namely, "the injury to the employee in the course of his employment."[38] Second, the Court observed that, in defining the rights and liabilities of the employer and employee arising from this factual predicate, Texas had provided the employee *a single and exclusive* right of action against the employer *in lieu of any other form of recovery.*[39] In other words, under Texas law, the operative facts—injury to the employee in the course of employment—gave rise to only one cause of action against the employer, and this cause of action was exclusive.

Thus, a Texas judgment on the cause of action was a *final and conclusive determination of all the employee's rights against the employer growing out of the operative facts.* If the judgment was in favor of the plaintiff-employee, then it was a conclusive determination that the employer should be liable for *no more than* the amount of the Texas award. Within Texas such a judgment precluded any further action by the employee against the employer based on the same factual predicate. Since Louisiana was obliged to give the Texas judgment the

33. *Caterpillar Tractor Co. v. International Harvester Co.,* 120 F.2d 82 (3rd Cir. 1941). *See Gambocz v. Yelencsics,* 468 F.2d 837 (3rd Cir. 1972); *Williams v. Ocean Transport Lines, Inc.,* 425 F.2d 1183 (3rd Cir. 1970). *But see Kern v. Hettinger,* 303 F.2d 333 (2nd Cir. 1962).

34. 320 U.S. 430, 64 S.Ct. 208, 88 L.Ed. 150 (1943).

35. *Id.* at 437, 442, 64 S.Ct. at 213.

36. *Id.* at 438, 441, 442, 444, 64 S.Ct. 208.

37. *Id.* at 444–445, 64 S.Ct. 208.

38. *Id.* at 444, 64 S.Ct. 208 at 216.

39. *Id.* at 434–35, 442, 64 S.Ct. 208.

same preclusive effect in Louisiana that it had in Texas, the Court concluded that "[t]he Texas award, being a bar to any further recovery of compensation for [employee's] injury, is, by virtue of the full

faith and credit clause, exclusive of his remedy under the Louisiana Act." [40]

We believe that the Supreme Court's decision in *Magnolia Petroleum* is dispositive in the instant case.[41] Plaintiff's cause

---

40. *Id.* at 442, 64 S.Ct. 208, 215.

41. The Supreme Court's decision in *Industrial Commission of Wisconsin v. McCartin,* 330 U.S. 622, 67 S.Ct. 886, 91 L.Ed. 1140 (1947), does not dictate a contrary result. In *McCartin* it was held that an Illinois workmen's compensation award did not preclude an additional award under Wisconsin's workmen's compensation statute. However, the Court stated that it was of "decisive significance" that the Illinois award itself explicitly stated that "This settlement does not affect any rights that applicant may have under the Workmen's Compensation Act of the State of Wisconsin." The Court stated:

> If it were apparent that the Illinois award was intended to be final and conclusive of all the employee's rights against the employer and the insurer growing out of the injury, the decision in the *Magnolia Petroleum Co.* case would be controlling here. 330 U.S. at 626, 67 S.Ct. at 889.

Thus, *McCartin* is clearly distinguishable from the instant case. In *McCartin* the Illinois award was explicitly *non*-exclusive. In the instant case the Virginia judgment was clearly intended to be final and conclusive of all plaintiff's rights against defendants arising out of the wrongful death. Therefore, as the Supreme Court recognized in *McCartin,* "the decision in the *Magnolia Petroleum Co.* case [is] controlling here."

We do not rest the distinction between *McCartin* and the instant case on this ground alone, however. Professors Reese and Johnson have carefully examined the implications of the *McCartin* case and its relationship to other decisions involving the Full Faith and Credit Clause, in their article, "The Scope of Full Faith and Credit to Judgments", 49 Colum.L.R. 153 (1949). They have concluded that, in a case such as this in which a plaintiff has the option of bringing his suit in one of two forums each of which would apply its own local law to the case, the central inquiry in determining whether a judgment in the first forum should bar a suit on the same transaction in the second forum is whether plaintiff has had the opportunity to raise the choice of law issue in the first forum. If plaintiff could have litigated the choice of law issue in the first forum, then he should be precluded from bringing a suit based on the same transaction in the second forum:

> [L]et us start with what is believed to be a clear case for the application of full faith and credit in all its vigor. A contract is made in State X to be performed in State Y. The courts of X look to the law of the place of

making to determine the validity of a contract, those of Y to that of the place of performance; under the local law of X the particular contract in question would be invalid, but the contrary would be true under the law of Y. The plaintiff, whom we will assume to be a life-long domiciliary of Y and one who will be dependent upon that state for support if he obtains no recovery in the present suit, brings suit in X and loses. Is his claim thereafter barred in Y despite the fact that he would certainly have won had he originally brought suit in Y, and although that state has a very real interest in his economic welfare? The answer, it is believed, must be in the affirmative. In the case put, the X court had three distinct questions to decide before it could arrive at a decision, namely (1) what were the facts of the case; (2) what law (whether that of X or of Y) should be applied; and (3) what ultimate conclusion would be reached by applying the law selected to the facts as ascertained. Determination of each of these three questions certainly involved a decision on the merits, and, as stated previously, the central purpose of the full faith and credit clause, and perhaps the only one clearly in the mind of the framers, was to insure that a valid judgment rendered with personal jurisdiction over the parties should not be relitigated on the merits. Without this rule there could be no certain end to a controversy with elements in two or more states until the question of what was the proper law to apply had been successively relitigated in each of those states. And such a result would obviously be intolerable in a country such as ours with its forty-eight quasi-independent states, each with its distinct legal system, and with complete liberty on the part of the inhabitants to pass from one state to another. True, this will frequently result in one state being forced to stand by powerlessly while the interests of its citizens are being conclusively determined in the courts of another. But this "is part of the price of our federal system."

> . . . . .

> . . . [Here] as is true of all ordinary choice-of-law cases, the court of any state in which suit happens to be brought will listen to the parties' arguments as to the proper law to be applied and then will apply that law which it considers the most appropriate for that particular case. In other words, subject to the limitations of local precedent and due process, the court is free to apply the law

930

of action for the wrongful death of her daughter has merged into the Virginia federal court judgment; it has been extinguished. Plaintiff may not now bring another suit in the District of Columbia on this same cause of action.

Understandably, like plaintiff in the *Magnolia Petroleum* case, plaintiff here argues that her suit in the District of Columbia is based on a different cause of action than the one on which her Virginia suit was based. Plaintiff relies exclusively on the fact that the District of Columbia treats its Survival Act and Wrongful Death Act as giving rise to two independent and separately maintainable causes of action. We note that in so doing the District of Columbia is applying *only one of many*[42] possible tests for determining whether particular causes of action are the same, namely, the so-called "violation of primary right" test under which different causes of action are deemed to exist for each substantive *right* infringed by a single wrong. The crux of plaintiff's argument, therefore, is that her judgment under the *Virginia* Wrongful Death Act should not bar an action under the District of Columbia Survival Act because a judgment under the *District of Columbia* Wrongful Death Act would not bar an action under the District of Columbia Survival Act.

*However, District of Columbia law does not govern the preclusive effect of the Virginia judgment.* As we have already indicated, it is fundamental that the *res judicata* effect of the first forum's judgment is governed by first forum's law, not by the law of the second forum. Thus, "the local law of the State where the judgment was rendered determines . . . what claims are extinguished by the judgment."[43]

Under Virginia law, the *res judicata* effect of the Virginia judgment is clear. Virginia has determined that the operative facts in this case—negligent conduct by one person causing the death of another—gives rise to one cause of action under the state's Wrongful Death Act. This cause of action is provided *in lieu* of any other form of recovery against the wrongdoer based on the same wrongfully caused death. In Virginia, therefore, a judgment under the Wrongful Death Act is conclusive between

---

of whatever state it sees fit. This is not true, however, of workmen's compensation in most states, for it is normally enforced by administrative commissions which are authorized to apply to other law but their own.

. . .

In the ordinary choice-of-law case, the interests of each state involved are protected by the opportunity afforded it, through the parties, of having the merits of its own particular law considered by the tribunal before which the suit is brought. In the typical workmen's compensation case, however, neither state nor litigant is afforded a day in court on the question of which of two or more competing laws should most appropriately be applied. Hence, it can plausibly be argued that in instances of this sort full faith and credit should not debar a state with requisite contacts from granting a supplemental award with appropriate credit for that already received. This after all was the prevailing view prior to *Magnolia,* and, in view of *McCartin,* is probably the law at the present time. All that has been attempted here is to express what is believed to be the correct rationale for this result.
49 Colum.L.R. 171–177.
We find ourselves largely in agreement with this analysis. In *McCartin* the plaintiff was not in a position to litigate the applicability of Wisconsin law in the Illinois tribunal. However, in our case plaintiff had a full opportunity to litigate the choice of law issue in the Virginia federal court. In that proceeding, she herself urged the application of Virginia law, and the court sustained her position. Thus, while the principles enunciated in *Magnolia Petroleum* may have been modified by *McCartin* in the context of workmen's compensation cases, they retain their vitality in the ordinary choice-of-law case.

**42.** Various tests for determining the scope of a cause of action have been suggested and used:

. . . Among the most common are that the cause of action is the same if: (a) the same principles of substantive and procedural law are applicable to both actions, (b) the same right is alleged to be infringed by the same wrong in both actions, (c) the judgment sought in the second action would infringe rights established in the first, (d) the same evidence would support both actions, or (e) the operative facts are the same in both actions.

Note, Developments in the Law: Res Judicata, 65 Harv.L.Rev. 818, 824–25 (1952).

**43.** Restatement Second, Conflicts of Laws § 95 (comment e) (1971).

the parties as to *all rights* arising from the operative facts. The merger of the exclusive cause of action into the judgment extinguishes *all claims* based on those facts. This must also be the effect of the judgment in the District of Columbia. Thus, plaintiff is precluded from bringing this suit in the District of Columbia courts.

This conclusion is unavoidable when it is considered that any possible District of Columbia judgment under the District Survival Act would be *irreconcilable* with the Virginia judgment. As we have already noted, this case does not present a situation in which Virginia simply does not provide for survival and the District of Columbia does. Under Virginia's remedial scheme, the Wrongful Death Act is designed to be the *exclusive* basis of recovery for wrongful death; it exists *in lieu of* an action based on the survival of the deceased's original claim and is intended to replace that claim.[44] The legislature has created this new right of action precisely because the deceased's original right of action does not survive. Thus, recovery under the Wrongful Death Act is conceptually predicated on the *non-survival* of the deceased's original claim. While the District of Columbia views wrongful death and survival actions as complementary, the Commonwealth of Virginia views them as mutually exclusive. It is clear, then, that a necessary element in the Virginia court's judgment was the determination that the deceased's original claim *did not survive.* Thus, a District of Columbia court could not enter a judgment for plaintiff based on the survival of the deceased's original claim without completely contradicting the very basis of the Virginia judgment. Any such District of Columbia judgment would, therefore, fail to give full faith and credit to the Virginia judgment.

There is still another reason why a District of Columbia judgment under the District's Survival Act would be inconsistent with the Virginia judgment. The premise of plaintiff's initial suit was that the local law of Virginia properly governed and defined all the rights and liabilities of the parties growing from the deceased's wrongfully caused death. Under Virginia's choice of law rules, Virginia's law was to govern *unless* another state had a more significant relationship to the occurrence. The judgment of the Virginia federal court was a final determination that Virginia law *did indeed* govern the rights and liabilities of the parties, and a necessary element in this determination was the court's conclusion that no other jurisdiction had a more significant relationship to the occurrence. This determination was *essential* to the judgment and, on its basis, the court awarded damages to plaintiff, and plaintiff accepted the award. Plaintiff has now brought a suit in the District of Columbia on the theory that District law governs the rights and liabilities arising from the operative facts in the case. Clearly this is inconsistent with plaintiff's previous position *which was sustained in the Virginia judgment.* It is inconsistent in more than a theoretical way, for its adoption would result in substantively changing the rights and liabilities of the parties as previously determined in the Virginia suit. Having already obtained a favorable judgment premised on her initial position, plaintiff is estopped from now taking a conflicting position. Whether this is described as "collateral estoppel" or some other species of estoppel, the result is the same. A District of Columbia court would be giving something less than full faith and credit to the Virginia judgment if, at this stage, it found that District law rather than Virginia law governed the rights and liabilities of the parties.

In sum, then, plaintiff was free to pursue her remedy *initially* in either Virginia or the District of Columbia. Either state could have properly applied its law *in the first instance.* But having elected to seek her remedy in Virginia, where the judgment was *res judicata,* the full faith and credit clause precludes her from again seeking a remedy in the District of Columbia upon the same grounds.

---

**44.** See text at notes 17–23, *supra.*