**Wanda Alexander HOSTON, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 79–1267.

United States District Court, District of Columbia.

June 22, 1983.

David M. Basker, Washington, D.C., for plaintiffs.

Jason D. Kogan, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Curtis E. Hoston, Jr., 28 years old, died on October 27, 1976, as a result of injuries received during a struggle with deputy United States marshals who held him in custody while he awaited arraignment before the Superior Court of the District of Columbia.

Contending that the United States is liable vicariously for the tortious conduct of its employees, members of the United States Marshals Service, plaintiffs have asserted that the deputy marshals, by use of excessive force, and without justification or excuse, intentionally battered Hoston causing his death. The allegation that the deputy marshals were negligent in not providing him prompt medical attention was abandoned at pre-trial.

Bringing their action under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), plaintiffs seek damages from the United States under provisions of the District of Columbia Wrongful Death Act, 16 D.C.Code § 2701. The plaintiffs are the widow (also Administratrix of the estate) and children of the decedent. While the Wrongful Death Act[1] was the only statutory basis of recovery referenced in plaintiffs' pretrial brief filed fourteen days prior to trial, plaintiffs, through counsel, now urge the District of Columbia Survival Act, 12 D.C.Code § 101,[2] as another basis for damages, although not pled in the cause. Intentional infliction of emotional distress,[3] concededly not pled, is also asserted as an additional claim.

The United States contends that the deputy marshals did not commit any tortious act against Curtis E. Hoston, Jr., that the marshals were justified in exercising such force as was reasonably necessary to subdue Hoston in their attempt to prevent injury or death to themselves and others, and that Hoston assumed the risk of force being used against him.

The matter was tried to the Court, without a jury.

The facts of this cause, now detailed, are vital to a full understanding of the conclusions reached, resulting in judgment for the defendant.

On October 27, 1976, at approximately 8:00 a.m., officers of the Metropolitan Police Department, responding to an outstanding fugitive warrant arising out of a pending narcotics offense in Prince Georges County, Maryland, appeared at the District of Columbia home of Rosa May Hoston to arrest her son, Curtis. Hoston's brother, Ulysses, and the mother, screaming profanely, joined Curtis Hoston's recalcitrant position as he defiantly refused to accompany the officers; a fracas ensued and other police arrived to "a policeman in trouble" radio summons. Hoston "swung" at the arresting officer, they struggled on the floor, it took several officers to subdue him and he was removed to police headquarters. At headquarters Hoston was oriented, lucid and cooperative, responding appropriately to inquiries during the 30- to 40-minute processing.

---

1. The Wrongful Death Act designed to compensate the spouse and next of kin of the deceased commensurate with the financial loss sustained, provides recovery based on "pecuniary benefits that the statutory beneficiaries might reasonably be expected to have derived from the deceased had he lived." *Semler v. Psychiatric Institute of Washington*, 575 F.2d 922, 924–925 (D.C.Cir.1978); *Runyon v. District of Columbia*, 463 F.2d 1319, 1322 (D.C.Cir.1972).

2. When properly pled and preserved, the District of Columbia Survival Act creates an action on behalf of the decedent through his estate; it creates an entirely separate and distinct basis for relief from the Wrongful Death Act.

3. While the tort of intentional infliction of emotional distress has long been recognized in this jurisdiction, *Clark v. Associated Retail Credit Men of Washington, D.C.*, 105 F.2d 62 (D.C.Cir. 1939); *Stewart v. Thomas*, 538 F.Supp. 891 (D.D.C.1982), the District of Columbia has not recognized a tort labeled "outrage", *id.* at 894, yet another basis for relief suggested by plaintiffs' counsel in closing argument.

Later that day, Hoston was placed in the custody of the United States Marshals Service, where he remained for all relevant times thereafter. He was transported to the basement cellblock of Building A, Superior Court of the District of Columbia, to be presented later that afternoon before Judge Alfred Burka, presiding over presentments/arraignments in Courtroom 17.

Prior to the presentment and sometime between 1:00 p.m.—3:00 p.m., Hoston was sent to the Building A office of Dr. Leonardo C. Maguidad, a psychiatrist with the Forensic Psychiatry Division, for a 10- to 20-minute psychiatric screening to determine his competency to stand trial. Dr. Maguidad's examination made no determination as to whether Hoston was, or could become, violent.[4] While responding rationally to some questions, oriented as to time, place and person, and aware of the charges against him, Hoston still appeared to be "rather preoccupied". His behavior was withdrawn and "flat" (emotionally unresponsive to various situations). Dr. Maguidad concluded that he was not competent to stand trial at that time, that he appeared to be psychotic (which could be a temporary status), and recommended in a brief written report that Hoston be treated at the District of Columbia Jail Infirmary. While this report was to be delivered to the courtroom for the purpose of apprising the presiding judge of this evaluation, there is no evidence that Judge Burka or any other court personnel were aware of these findings prior to the significant events which soon thereafter transpired in Courtroom 17.

Paul B. Tierney, an attorney appointed by the Court under the Criminal Justice Act to represent Hoston on the fugitive warrant, interviewed Hoston for ten minutes at the office of the Forensic Psychiatry Division between 3:30 p.m. and 3:40 p.m. Hoston stared straight ahead and made no response to the inquiries as to what Hoston wanted Tierney to do as his attorney. Uncertain as to whether he was unwilling or

unable to respond—"I had no way of knowing if Hoston understood what I said"—Tierney found no need then to bring his client's silence to the attention of Judge Burka or to discuss Hoston's attitude with anyone else.

Shortly after 4:00 p.m., deputy United States marshals took Hoston to Courtroom 17, located on the third floor, west side of Building A, where arraignments/presentments were held daily. The judge's bench was on the north side of the courtroom. To the right of the bench was the "green door" through which prisoners entered the courtroom from one of the two cellblocks situated behind the courtroom. The door opened into the cellblock area; it could be pushed open by the mere exertion of leaning against the door. The prisoners awaiting arraignment sat in two reserved rows of chairs to the right of the judge's bench. There were six chairs in the back row (next to the windows on the west side of the courtroom) and five chairs in the front row. As prisoners, one by one, completed the process before the judge, other prisoners would be brought in from behind the green door to fill the vacant chairs.

Curtis Hoston was seated in the first or second seat nearest the green door in the front row, awaiting his turn to appear before Judge Burka. Several of the other chairs in the two rows were occupied by prisoners who, by practice and with approval of the judges, were not handcuffed while in the courtroom. Deputy United States marshals were on duty in Courtroom 17 to guard the prisoners, protect the judge and maintain security. As approved by the judges, the deputies carried loaded weapons in the performance of their duties in this large, "heavy volume" courtroom, which, on the average, handled more than fifty arraignments daily. Although the majority of prisoners had already been processed by 4:00 p.m., a number of spectators, lawyers and court personnel remained in the courtroom.

---

4. Dr. Maguidad neither testified that Hoston's actions in the courtroom were associated with a mental condition or that Hoston was unaware of his actions when he reached for deputy Burch's gun.

George H. Hibbard, the courtroom clerk, observed Hoston as he was escorted into the courtroom by two marshals and seated there. While he recalled an awareness that there was "some mental problem", the file did not contain any such supporting document from Forensic Psychiatry. In customary circumstances Dr. Maguidad's report would have gone first to the District of Columbia Bail Agency which would make its own investigation and recommendation. When presented, Hoston would stand before Judge Burka with his attorney, be apprised of the charges and his rights; bond would be set after the Judge was notified of the Bail Agency report which would reference Dr. Maguidad's findings. Mr. Hibbard testified that "to me it was a total surprise when Hoston lunged at the marshal. [There was] no forewarning." Hoston had appeared calm, his hands had been folded on his lap and he gave no indication that he would engage in the acts which led to his death. Even had the psychiatrist's report been before the Court, it did not foretell violence or aggression.

Deputy United States Marshal Carlisle Burch was on duty at his station between the judge's bench and the cellblock, several feet from where Hoston was seated. A prisoner seated in the back row and to the left of Hoston rose from his chair and began to step forward towards the judge. As deputy Burch helped put this man back in his seat, another prisoner (later identified as Hoston) arose from his chair and grabbed deputy Burch around his waist, putting his hands under the suit jacket where the marshal carried his loaded .38 caliber Colt Cobra, in an attempt to get the weapon. Burch seized Hoston's hands, which were on the weapon; during the grappling, the revolver came out of its holster, attached to Burch's belt and under his trousers. Both men put both hands on the weapon as each tried to gain possession. They were approximately three feet from the green door cellblock as they moved about in a "curious" circling dance. Mindful of his safety and that of those persons in the crowded courtroom, trying to regain control of his gun as it swung up and down, deputy Burch attempted to point it towards the ceiling, while maneuvering Hoston with his body and, in particular, by his legs, to a more secure area (the cellblock) outside the courtroom area. Inside the cellblock there was less chance of anyone getting hurt should the weapon discharge and Burch could get assistance. The struggling men either fell through the green door of the cellblock or Burch pushed it open. As Burch and Hoston struggled through the doorway, and while the green door was still almost fully open, the weapon discharged, the bullet hit the door jamb and ricocheted into and across Courtroom 17, hitting a beam on its ceiling. No one was hit by the gunshot. The struggle continued into the cellblock as the door closed.

Deputy United States Marshal Ernest Stevenson, on duty in the cellblock, had seen the door fly open as Hoston came through backwards as he and Burch continued the struggle. He had observed both Hoston and Burch with their hands on the gun; Hoston had his finger on the trigger. Stevenson heard the gun discharge as he immediately reached out to assist Burch.

Hoston slipped from Stevenson's attempted grasp on his neck and was punched in the face one time as Stevenson tried to get him to drop the weapon. During the struggle, as the three grappled for the revolver, Burch and Stevenson remained fully aware of the gravity of the situation, facing death or severe bodily injury with five live rounds still in the gun. Hoston and Burch both maintained their grasp on the gun; they spun around, "in a weird sort of dance", and then fell down on the hard concrete-like floor. Hitting the floor first, Hoston landed on his back as the struggle continued. Stevenson testified that the "weight of him falling pulled me and Burch on top of him" almost immediately thereafter.

Burch, then 52 years old, at 6'2", weighed 240 pounds. Stevenson, 5'9" tall, wearing a royal blue jumpsuit, weighed 260–270 pounds. Hoston was 6'1" tall, weighing 150 pounds. Burch's "front" and knee collided in the area of Hoston's stomach; Stevenson landed on Hoston's left side chest area with

his knee, so that Burch and Stevenson were then, in effect, "side by side" on top of Hoston with their combined weight. Believing he was fighting for his life, Stevenson immediately hit Hoston twice in the mouth with his slapstick to get Hoston to drop the gun. Hoston still maintained control of the weapon.

Deputy United States Marshal Herbert Rutherford, who had witnessed the courtroom fracas, and had observed Hoston with his hands on Burch's gun, had drawn his gun in the courtroom but did not fire it there in fear someone might be hurt. Hearing Burch's revolver discharge, as he disappeared with Hoston behind the green door, Rutherford cautiously entered the cellblock from the courtroom. He witnessed deputies Burch and Stevenson struggling on the floor with Hoston. Rutherford thereupon kicked Hoston in the chin area and chest at least two or three times in an attempt to help subdue him.[5] Hoston finally released the weapon. After a brief struggle to get his arms back, Hoston was either rolled over or turned over onto his stomach; Rutherford handcuffed his hands behind his back. It is the marshals' contention that Hoston was neither kicked nor hit after he was handcuffed.

When Rutherford attempted to lift Hoston, he slipped and fell face forward on the floor.[6] Several marshals carried Hoston to the elevator and descended in the prisoner elevator to the basement. Upon alighting from the elevator, they took Hoston to a cellblock where Hoston was placed on the floor of an isolation cell. A deputy clerk who happened to be interviewing defendants in this cellblock saw Hoston being carried by the marshals. At the request of the marshals he called the nurse. Hoston appeared to be alive when this witness opened the celldoor to enable a marshal to remove the handcuffs. Another deputy United States marshal, responding to the cellblock "within a couple of seconds or a few minutes," testified she did not see anyone kick or hit Hoston; she did not form an opinion as to whether he was dead or alive as he lay on the floor of that cell.

The nurses' office, located one floor above the basement cellblock, had been contacted. A nurse arrived in the isolation cell within five minutes of the time Hoston had been placed there. Her examination revealed that Hoston was dead.

To support their contention that the marshals used excessive and unnecessary force on Hoston which caused his death, plaintiffs rely on the testimony of Michael Lieber, an attorney formerly practicing law in the District of Columbia, who had initially been present in another area of Building A. He testified on direct examination that he was walking down the central hall on the third floor when he passed by the hallway which runs parallel to Courtroom 17 from the central hallway to the cellblock behind the green door where he observed the marshals assault an unknown man. The inconsistencies in Lieber's testimony were multiple, extravagant and significant. Dependent on when he testified (be it testimony before the grand jury, or his deposition a few days prior to trial or at trial, and then whether it was his direct examination or cross-examination) Lieber averred that he was six feet from the mesh covering the bars, or two feet, or right against the bars, that he ob-

---

**5.** Dr. Luke, the Medical Examiner, testified that the abrasion located on Hoston's chin was consistent with it being made by the point of a shoe or made by a kick. Rutherford testified that "I thought [the marshals] needed my help. I could have shot him but I kicked him instead."

**6.** Later one tooth was found in the track of the elevator and another tooth in the elevator. The autopsy reflected that while two teeth had been avulsed, it could not be determined when this happened. It is logical to conclude that those teeth were Hoston's. This is consistent with the occurrence of a fight and the trauma therein: either the kickings noted above or Hoston's face impacting with the floor, or both incidents. Although plaintiffs argue that the location of the teeth in the elevator compels the conclusion that the fatal injuries were inflicted "after the prisoner was disarmed, taken to the elevator, and removed from the sight of any additional witnesses" there is no credible evidence that the struggle between the deputies and Hoston continued after Hoston released control of the gun.

served two or three or four marshals all wearing suits (none in blue denim outfits) none of whom were extraordinary in size, all whom he knew at the time or, they were "big", "pretty big", or, he could not see the faces of two of the marshals because the "lighting was so bad I didn't recognize them as anyone I knew", or, it was "difficult to see specific things"; "I think the marshals were black but the lighting was poor." Had someone "been holding a newspaper up on the other side of the bars", he would have been able to read it since "it was clear as air. I mean it was no problem seeing." One of the marshals, Lieber contended in his grand jury testimony, was kicking or stomping in the back, on his buttocks, on the side, the waist, or below the waist (but "not above the waist"), an unidentified, unresisting, unarmed man who lay face down. Or, Lieber later testified, the kicking was on the upper part of the body "around" his waist, "above" the waist, "probably in the back or the side".[7]

Throughout his testimony, charitably characterized as incredible, Mr. Lieber demonstrated that—at the very best—his recollection was faulty and his observations clouded. His testimony cannot be credited.

Hoston was transported to the Medical Examiner's Office. Dr. James Luke, the District of Columbia Medical Examiner, performed the autopsy. He determined that Hoston's death was due to compression of the chest and laceration of the heart with hemopericardium.

In addition to the traumatic, recent avulsion of two incisors, the autopsy and anatomic findings also revealed multiple contusions, lacerations and abrasions of the facial skin, lips, anterior chin, and external body surface, including superficial abrasions of the back of both hands. The force was spread over a wide area causing simultaneous trauma with no specific site of impact. These injuries did not contribute to Hoston's death. Dr. Luke testified that these findings were wholly consistent with the witnesses' testimony concerning the struggle; the evidence did not reflect a person being repeatedly kicked and/or stomped. There were but two abrasions on one leg and one abrasion on the other leg.

Hoston also suffered two fractured cartileges, one on his left side, the other on his right side. There was a contusion on the back side of the right lung which indicated the force involved. The same one blow—one force—covered the whole center part of Hoston's body up to his heart and created damage to the heart, the cartilege and the lung.[8] These injuries, Dr. Luke explained, were consistent with a struggle, Hoston falling on his back on a hard surface, with the quarter ton weight of deputies Burch and Stevenson compressing on the chest. While no one can predict the amount of force that might be required to produce this death-causing injury, it is undoubted that this kind of laceration, which caused the death of Curtis E. Hoston, Jr., could not have been caused even were one to hit with all one's strength directly into the heart/chest area. It was a "strictly random chance in physics" that the heart chamber was then filled with blood and subjected to an extraordinary force exceeding 500 pounds. While the lacerations of the heart caused the death of Hoston, death was not instantaneous. Hoston still had the strength and ability to struggle momentarily after being injured and could have lived,

---

7. The autopsy did not reveal any abrasions or bruises on Hoston's chest, stomach, back or sides nor any evidence on the body of kicking or stomping.

8. The defendant expresses well the Medical Examiner's conclusions and testimony:
"The heart was compressed by the impact of Deputies Burch and Stevenson on Hoston's heart. This compression then forced the blood in the heart to tear or lacerate the heart in two places. The massive flow of blood from inside the heart to the sac surrounding the heart, caused Hoston's circulatory system to cease functioning. That Hoston's death was caused as a result of Deputies Burch and Stevenson falling on him [at that precise time and place] was a fortuitous event, for if the blood were not in the heart at the moment of impact, there would have been no lacerations caused by the pressure of blood and Hoston would still be alive." (Defendant's Final Proposed Findings of Fact and Conclusions of Law, note 9).

according to the Medical Examiner, for "a matter of minutes" after such a trauma. Even had a doctor been called within ten minutes of this injury he could not have saved Hoston's life.

Born in 1948, Curtis E. Hoston, Jr., graduated in 1966 from Eastern High School in the District of Columbia. A chronic drug user, who had used heroin and other drugs since at least the late 1960's, and was still using heroin at the time of his death, he held a variety of odd jobs until the time of his arrest in August, 1968 for armed robbery. Convicted in 1969 of armed robbery, assault with a dangerous weapon and carrying a dangerous weapon, he was sentenced to serve concurrent terms of 3 to 16 years, 3 to 9 years, and one year. In 1971 Hoston was convicted in the District of Columbia of assault on a police officer with a dangerous weapon and carrying a dangerous weapon. Sentenced to serve concurrent sentences of 3 to 9 years for each offense, the 1971 sentences were ordered to be served concurrently with the 1969 sentences. Hoston was incarcerated at Lorton Reformatory from October 21, 1969 until placed in a halfway house on March 18, 1974. Arrested in Maryland in 1975 for possession of LSD and a syringe, as well as larceny (the charges that eventuated in his arrest on October 27, 1976 on a fugitive warrant), he was recommitted to Lorton Reformatory for two months in November 1975 for parole violations. He was released from Lorton in January, 1976 and, other than his fugitivity, not known to have been further involved in criminal activity until his arrest/death in October 1976. Absent other difficulties, he was eligible for parole termination three and one-half years later, on April 24, 1980.

Without any productive work history, Hoston's sole demonstrable income was from a $4,500 per year stipend from the Lorton-University of the District of Columbia College Program.[9] Hoston had entered this program in 1970 while at Lorton Reformatory and continued in the program for approximately six years until the year of his death. He had completed the equivalent of his sophomore year, was performing poorly and would have been expelled from the program within a year had his performance not improved. Dr. Andress Taylor, formerly with the University of the District of Columbia, as Director of Lorton's college program, testified that although "we were attempting to motivate him ... and he could have graduated ... he was unable to muster discipline necessary to do it" and therefore, "there is no way of forecasting what would have happened [to Hoston] after 1976 as to finishing school and getting a job."

Plaintiff married plaintiff Wanda Alexander Hoston in 1973 while on a furlough from Lorton Reformatory. Their one child, Ayodele, was born April 2, 1973. His daughter, Curtrina, by another woman, was born in 1968; she is currently in the custody of her natural grandmother, Marietha Brown.[10] While Hoston made monetary contributions to his wife and their child, using part of the stipend he received from the work-study program, the sums varied in amounts ranging from nothing to $50 to $150 per month. The frequency of contributions was uncertain and erratic. Wanda Hoston testified that she was always primarily responsible for her own support and that of their child, Ayodele, during the time Hoston was alive and could have managed without contributions from him. She and

---

**9.** Hoston was transported to the District of Columbia on certain days, attended college, worked part-time in the school in a clerical capacity and was returned to Lorton at night. As a result of disciplinary actions resulting, among other reasons, from a continued use of drugs, Hoston was suspended for six months from the program commencing July 1972. He resumed the program in September 1973.

**10.** At time of her administrative claim, Wanda Alexander Hoston did not demonstrate her au-

thority to represent Hoston's child by another woman. *See Triplett v. United States,* 501 F.Supp. 118 (D.Nev.1980). Nonetheless, as trial commenced, to at least satisfy Fed.R.Civ.P. 17(c), plaintiffs moved in open court to amend their complaint to substitute Curtrina's grandmother as that child's next friend and guardian. Ruling was reserved pending plaintiffs' introduction of proof of this matter during this trial through that child's grandmother. Plaintiffs did not avail themselves of this allowance.

Ayodele have managed financially since Hoston's death.

While Wanda Hoston believed her husband made "some" support contribution on behalf of Curtrina, there has been no evidence of what amounts he contributed at any time for this child.

According to the generalized actuarial tables Hoston, at 28 years of age, had a life expectancy of an additional 39.9 years, with a work-life expectancy of 30.2 years.

This complaint brought under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.,* alleges that deputy United States marshals, by use of excessive force, and without justification or excuse, intentionally battered Curtis E. Hoston, Jr., so as to cause his death.

■ To effect an arrest, "the rule is that an officer has the right to use such force 'as under the circumstances appears reasonably necessary' ... and ... the [trier of fact] must judge of the necessity 'in the light of the circumstances as they reasonably appear to the officer at the time.'" *Bell v. United States,* 254 F.2d 82, 85 (D.C.Cir.), *cert. denied,* 358 U.S. 885, 79 S.Ct. 126, 3 L.Ed.2d 113 (1958).

■ An officer is also justified in using "such force as under the circumstances appears reasonably necessary" to maintain that custody or to prevent an escape. *See* Restatement (Second) of Torts § 134 (1965). However, were a law enforcement officer to use any force in excess of that reasonably necessary to accomplish his lawful purpose (here, to subdue a prisoner), he would be liable for any injuries (or death) and damage suffered as a result thereof. *Smith v. District of Columbia,* (D.C.App.1979), 399 A.2d 213; *Wade v. District of Columbia* (D.C.App.1973), 310 A.2d 857.

■ In the instant action, the deputy United States marshals used such force as was reasonably necessary to subdue Curtis E. Hoston, Jr. Hoston had deliberately grabbed the gun of a deputy United States marshal. There can be no doubt of the imminent danger of death or severe bodily harm to every person in the courtroom, and to deputies Burch and Stevenson, in particular, in that body-to-body confrontation, as Hoston struggled determinedly for controlled possession of the weapon.

Can there be any doubt of the duty—the mandate—of the deputy United States marshals to maintain custody of their prisoner (Hoston) to prevent him from injuring anyone with the gun, to prevent this defendant (there on a charge of fugitivity) from escaping, and to maintain the security of the courtroom, its personnel, the other defendants and other persons present, including the judge?

Deputy Burch acted swiftly, calmly, and commendably during the struggle with Hoston to uphold these duties. Placing his own person into the closest proximity to death or severe bodily injury, he immediately reacted to the situation by maneuvering Hoston away from the courtroom toward the cellblock to minimize danger to all others and by pointing the pistol at the courtroom ceiling so that no one would be shot if the gun discharged. The ultimate result is that no one was injured when the gun did discharge as Hoston pulled its trigger. Once in the cellblock area behind Courtroom 17, the deputy marshals (Burch and Stevenson initially; later, Burch, Stevenson and Rutherford) again in the compelled avoidance of death or severe bodily injury, had to regain possession of the loaded gun and control of their prisoner. To achieve these purposes, Hoston had to be subdued to force his release from the gun. It is clear he would not release the gun voluntarily. Hoston died when the deputies fell on him accidentally in the continuing effort and struggle to overcome his resistance and to regain control of the gun.

The Court cannot subscribe to plaintiffs' argument that Hoston was subjected to "an unnecessary, willful beating, both during the time that the participants were struggling for control of the weapon and thereafter." *See* Plaintiff's (sic) Proposed Findings of Fact and Conclusions of Law, at 10.

It was Hoston who incited the events that led to his death and these law enforcement officers used no more than that degree of

force necessary to subdue Hoston. Certainly the struggle itself produced its share of injuries: the punch in the face, the hits in the mouth with the slapstick, the kicks in the chin area and chest, resulting in contusions, lacerations and abrasions, and the traumatic avulsion of the incisors. But it cannot be overlooked that those injuries did not contribute to Hoston's death and were not, under the specific circumstances detailed herein, more force than necessary to subdue Hoston and to secure his release of the loaded weapon. The actions of the deputies were in reasonable and essential response to the presenting situation. Those reactions of the deputies were required to protect their lives and/or the lives of others or, at the very least, to prevent severe bodily harm to themselves or others.

Plaintiffs further contend that Hoston, disarmed and incapable of resistance, was assaulted and battered before and during the time he was taken into the cellblock elevator, which beating they say caused his death. Disputing the defendant's witnesses' claim that the heart compression causing death occurred when deputies Burch and Stevenson fell onto Hoston's chest with their combined weight in excess of 500 pounds, at the time those witnesses verified that act happened, plaintiffs argue instead that the fatal injuries were inflicted after Hoston was disarmed and taken to the elevator.

Evaluation of the entire record, including but not limited to the medical evidence (which wholly supported the marshals' version of how the injuries occurred), and consideration of the credibility and weight to be given to the testimony of the plaintiffs' and the defendant's witnesses, leads directly, reasonably and convincingly to the Court's conclusion that the force used by the deputies to subdue Hoston was, under all circumstances herein, essential, and, accordingly, reasonable. Tragically, the final aspect of that force, by which the deputy marshals fell on the chest of the armed defendant-prisoner was a moment of chance that could neither be anticipated nor avoided nor, under the extraordinary situation herein, characterized as excessive force.

It has therefore not been shown by the plaintiffs that the deputy United States marshals committed any tortious act against Curtis E. Hoston, Jr. be that act described as assault, battery, intentional infliction of emotional distress or "outrage". The evidence was otherwise. Convincingly and conclusively, beyond a preponderance of the evidence and indeed well beyond a reasonable doubt, the record and trial demonstrated that plaintiffs did not bear their burden of proof as to liability and are therefore not entitled to recover damages from defendant.[11]

Accordingly, judgment shall be entered this date in favor of the United States of America and against the plaintiffs, Wanda Alexander Hoston, Ayodele O. Hoston and Curtrina Hoston.

---

11. Recognizing the distinctions in the parties' burdens in civil and criminal actions, it should, nonetheless, be noted that two grand juries were separately convened to review the circumstances of Hoston's death while in custody of the deputy United States marshals and to determine whether the examination justified the return of an indictment. No indictments were returned in this matter.