**John M. DOWD, Plaintiff,**

v.

**Samuel Ray CALABRESE, Defendant.**

**William M. KRAMER, Plaintiff,**

v.

**Samuel Ray CALABRESE, Defendant.**

**William M. KRAMER, Plaintiff,**

v.

**James A. DRINKHALL, et al., Defendants.**

**John M. DOWD, Plaintiff,**

v.

**James A. DRINKHALL, et al., Defendants.**

**James A. DRINKHALL, Plaintiff,**

v.

**William M. KRAMER, Defendant.**

**Civ. A. Nos. 80–0911, 80–0912, 80–3324, 80–3325 and 81–1266.**

United States District Court, District of Columbia.

May 30, 1984.

Thomas C. Green, Washington, D.C., for plaintiffs.

Michael T. Kenney, Santa Ana, Cal., Michael M. McCarty, Washington, D.C., Sara E. Lister, Togo D. West, Patterson, Belknap, Webb & Tyler, Washington, D.C., Floyd Abrams, Charles A. Gilman, Cahill, Gordon & Reindel, New York City, Gregory L. Diskant, Patterson, Belknap, Webb & Tyler, New York City, Richard L. Levie, U.S. Department of Justice, Civil Division, Washington, D.C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

These are consolidated actions revolving around several articles published in 1979 by the *Wall Street Journal*. The principal lawsuits [1] charge that the Dow Jones Company, publisher of the *Wall Street Journal;* Lawrence O'Donnell, managing editor of that newspaper; and Jim Drinkhall, one of its reporters, libelled William M. Kramer

and John M. Dowd, who at the time the articles were published were members of the Justice Department's San Francisco Strike Force. In a second lawsuit,[2] Drinkhall charges Kramer with invasion of privacy and deprivation of constitutional rights under color of law.[3] Presently pending before the Court, and decided herein, are defendants' motions for summary judgment with respect to each of the five claims in the Kramer-Dowd suit, and motions for summary judgment or partial summary judgment filed by the two sides in the Drinkhall action.

### I

The second cause of action in one sense constitutes the heart of the lawsuit brought by Kramer and Dowd, and it will for that reason be considered first. That cause of action charges that the defendants libelled the plaintiffs in an article—"Ordeal at McNeil"—written by Drinkhall and published by the *Wall Street Journal* on April 11, 1979. Briefly summarized, the article reported that Kramer and Dowd had developed and implemented an unethical plan to force Samuel Ray Calabrese, a convicted felon with reputed organized crime connections, to cooperate with the government against other alleged organized crime figures, in particular one Morris Shenker, a Las Vegas casino owner.

According to the article, among the tactics used by Kramer and Dowd to accomplish their objective were the following: the levying of additional charges against and prosecutions of Calabrese; his special detention and solitary confinement during his incarceration at the McNeil Island federal penitentiary; the spreading of rumors about Calabrese and attacks on him by other inmates; the grant of immunity to Calabrese with respect to testimony before grand juries and the threat of contempt if he failed to testify; the undermining of

1. C.A. No. 80–3324 and C.A. No. 80–3325.

2. C.A. No. 81–1266.

3. Likewise pending are actions by Kramer and Dowd against Samuel Ray Calabrese, who is presently incarcerated in federal prison (C.A. Nos. 80–0911 and 80–0912).

financial support for Calabrese's family through action by the Internal Revenue Service; the planting of false rumors that Calabrese was cooperating with the government; and threats of a denial of parole.

Defendants acknowledge that they are unable to move for summary judgment on the issues of truth and malice with respect to this cause of action, and they do not do so. Rather, their motion proceeds on the theory that the second cause of action should be dismissed because under California law [4] the publisher of allegedly libelous material must be afforded an opportunity for a retraction as a prerequisite to a defamation action—an opportunity which allegedly was not afforded here.[5]

First. Neither the District of Columbia nor any other jurisdiction the laws of which might conceivably govern has a retraction statute. There is therefore a threshold issue whether California law, with its retraction statute, is applicable to this controversy, for if California law does not apply, the request for dismissal must fail.

■ In a diversity action, this Court sitting in the District of Columbia is obligated under *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) to apply the choice of law rules prevailing in this jurisdiction. *Klaxon v. Stentor Electrical Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Like many states, the District of Columbia has adopted the so-called "governmental interest analysis" approach to resolving choice of law questions.[6] Under that approach, the Court applies the law of the jurisdiction with the most significant interest in the

resolution of the particular controversy. *Blair v. Prudential Ins. Co.,* 472 F.2d 1356, 1359 (D.C.Cir.1972); *Fowler v. A & A Company,* 262 A.2d 344, 348 (D.C.App. 1970).[7] Thus, with respect to the allegedly fatal failure to demand a retraction, the issue is whether California has a more substantial interest in the resolution of these lawsuits and the underlying claims than any other jurisdiction.

Defendants have advanced basically two reasons in support of their contention that California should be regarded as having the most compelling governmental interest with respect to "Ordeal at McNeil." In their original brief, they argued that this is so because the article was principally researched, investigated, and written in California;[8] in their reply brief, the emphasis was changed to the assertion that California law is paramount because Kramer lived and worked there prior to the publication of the articles which gave rise to this lawsuit.[9] Neither claim is persuasive.

■ The weight of authority considers that the law to be applied is not that of the place where the offending article was written, researched, or published, but that the place where the plaintiff suffered injury by reason of his loss of reputation is the more significant. See, *e.g.,* Restatement (Second) of Conflict of Laws § 150 (comment e); *Hanley v. The Tribune Publishing Company,* 527 F.2d 68, 70 (9th Cir.1975). The Court will follow that rule. The law of libel is designed to protect individuals from defamation. Although, to be sure, there is some public and governmental interest

---

4. Cal.Civ.Code § 48a.

5. As an alternative to the dismissal, defendants argue that under the California statute all general and punitive damages must be stricken. See generally, *MacLeod v. Tribune Publishing Co.,* 52 Cal.2d 536, 343 P.2d 36, 42 (1959).

6. *Semler v. Psychiatric Institute of Washington, D.C., Inc.,* 575 F.2d 922, 924 (D.C.Cir.1978); see also, *Tramontana v. S.A. Empresa De Viacao Aerea Rio Grandense,* 350 F.2d 468, 471–76 (D.C. Cir.1965); see also, Restatement (Second), Conflict of Laws § 145.

7. As the court said in *Semler v. Psychiatric Institute, supra,*

the method of governmental interest analysis is (1) to identify the state policies underlying each law in conflict, and (2) to decide which state's policy would be advanced by having its law applied to the facts at bar.
575 F.2d at 924.

8. Memorandum at 24.

9. Reply memorandum at 32–35.

elsewhere,[10] by far the greatest interest lies in the place where the victim's reputation suffered injury. Upon the facts of these cases, it is clear that the damage to the reputation of Kramer and Dowd as a consequence of "Ordeal at McNeil" occurred primarily in the District of Columbia.

Kramer spent twelve of the last fourteen years in Washington, D.C., and almost all of his professional ties and contacts were and are here. He received his legal education at George Washington University, and he is a member of the District of Columbia Bar.[11] Prior to his transfer to San Francisco, he had been working for many years for the U.S. Department of Justice in its Washington headquarters. The article concerned his activities while he held a position with that Department, and it was essentially his professional reputation with the Department at the seat of government that was damaged by the article. Kramer's superiors were located in the District of Columbia, and they were the persons who raised questions concerning his conduct as a consequence of the article, investigated him, and called him to account for his alleged behavior.[12] After the articles were published, Kramer was not able to remain with the Department of Justice, and he resigned. Because of his professional ties to the District of Columbia, his job opportu-

nities were here, and he returned to and is now practicing law in Washington.

As indicated, defendants argue in their reply brief that Kramer's reputation was injured primarily in California. That contention is not persuasive. To be sure, Kramer was residing in that state at the time the articles appeared,[13] and he intended to continue working there as a member of the San Francisco Strike Force. But these minimal contacts cannot be said by any measure to outweigh the far more weighty, solid, and lasting contacts Kramer had in the District of Columbia discussed above and the damage to his reputation that occurred in the District.[14]

The issue is equally clear with respect to Dowd. Indeed, defendants make only a perfunctory effort to demonstrate that California law should apply to his claim. Dowd lives in the Virginia suburbs of the national capital; his professional career and his personal and professional ties are all in the District of Columbia; the article concerned his activities while he was the head of the Washington, D.C. Strike Force Team; and when the article was published, he was in private practice in Washington where he still practices. To state, as do the defendants in their principal brief, that, "[a]s to Dowd, the question is necessarily closer," [15] is modest understatement indeed.[16]

10. If a different test were to be applied, and if for that reason jurisdictions other than the District of Columbia were to be considered, California would not be the only state to qualify. Drinkhall travelled to Utah, Nevada, and Washington State in interviewing his various sources; the editing of the article was done in New York; and the story was datelined "McNeil Island, Washington." It should be observed also that we are not dealing here with a local, California publication, but with a national newspaper published in New York.

11. Kramer is not a member of the California bar.

12. Those who required Kramer to provide explanations included the Assistant Attorney General, the lawyer who conducted a detailed investigation of Kramer's conduct, and the Deputy Chief of the Organized Crime Section, among others, all of them located in Washington, D.C.

13. He resided in California because the Department had assigned him there as part of its nation-wide Strike Force program.

14. Defendants contend that Kramer returned to Washington because the damage to his reputation in California had made it impossible for him to continue to work there. Reply memorandum at 34. That is by no means certain. Actually, it appears that Kramer returned here not because of the injury to his reputation in California but because, due to his long involvement in the District of Columbia legal community, it was simply easier for him to find a professional connection here.

15. Memorandum at 26. In their reply brief, there is no mention of Dowd at all with respect to the second cause of action.

16. See note 16 on page 1212.

■ The Court concludes that a governmental interest analysis unerringly leads to District of Columbia law as the law to be applied. The District of Columbia has no retraction statute to stand in the way of this libel action, and defendants' motion must therefore fail on this basis alone.

■ Second. If the California retraction statute applied, it would not help defendants. Kramer did, in fact, demand a retraction, and he thus complied with that law.

Nineteen days after the article appeared, Kramer sent a letter to Laurence O'Donnell, managing editor of the *Wall Street Journal*, detailing with considerable specificity the various claimed inaccuracies and distortions. The letter implicitly demanded a retraction even if that precise term was not used. That, moreover, is just how O'Donnell construed it, for he responded that, although it was "the policy and routine practice of the *Wall Street Journal* to publish corrections of material errors ... since we have seen no factual support for any allegation of material inaccuracy with respect to the Calabrese article, no such correction would be appropriate." Indeed, the second Drinkhall article, published on December 12, 1979 (see Part V *infra*), conceded that "Mr. Kramer demanded a retraction of the portions of the article attributed to him." [17]

Defendants also argue that the retraction demand was addressed not to the publisher—as they claim it should have been under the California statute—and that it was defective also for that reason. The Kramer letter, as noted, was addressed to O'Donnell, the *Wall Street Journal*'s managing editor. That, according to defendants, was the wrong addressee, the right one being "Dow Jones Company, Incorporated." At the same time, defendants concede that, had Kramer addressed the letter to the corporation, it would have been promptly forwarded to O'Donnell for action. Transcript of Proceedings May 7, 1984 at 23. In view of that concession, it is difficult to visualize a more technical argument than defendants' insistence that the retraction demand was mailed to the wrong addressee. The fact is that it was O'Donnell, rather than someone in the corporate hierarchy of the Dow Jones Company, who had the power to decide whether the *Wall Street Journal* should or would publish a retraction; it was O'Donnell who received Kramer's letter; and it was O'Donnell who decided that there would be no retraction.

In *Gomes v. Fried*, 136 Cal.App.3d 924, 937, 186 Cal.Rptr. 605, 613 (1st Dist.1982), the California court stated with respect to that State's statute that

letters written to request retraction of a statement do not comprise formal legal complaints; we cannot expect that they will conform to the niceties of common law pleading. In enacting section 48a the Legislature intended to afford publishers an opportunity to correct committed errors before subjecting them to liability; it did not intend to build technical barricades to recovery by the individual who had given notice sufficient to a reasonable publisher acting in good faith of the claimed error.[18]

Clearly, the *Wall Street Journal* had such notice here, and there was thus compliance with the California law.

Defendants' motion to dismiss the second cause of action will be denied.

## II

The first cause of action charges a conspiracy between Drinkhall and Calabrese to

---

16. The clear-cut answer with respect to Dowd is an additional reason not to relegate his co-plaintiff Kramer to California law.

17. This recognition by the *Wall Street Journal* itself is hardly undermined because defendants attribute it to an editor who was not involved in responding to Kramer's original letter. It may be assumed that, particularly in view of the history of this controversy, the *Journal* chose its words carefully.

18. See generally, *Kapellas v. Kofman*, 1 Cal.3d 20, 81 Cal.Rptr. 360, 360, 459 P.2d 912, 918 (1969); *Field Research Corp. v. Superior Court*, 71 Cal.2d 110, 77 Cal.Rptr. 243, 453 P.2d 747 (1969).

defame plaintiffs by means of "Ordeal at McNeil." The motion for summary judgment with respect to this claim is predicated upon the proposition that the evidence is not adequate to prove the existence of such a conspiracy.

Plaintiffs do not deny that their evidence in support of this cause of action does not differ materially from that which they would cite to sustain the second claim discussed in Part I *supra*, but they suggest that this evidence supports both their individual claims of libel against Drinkhall and Calabrese and their conspiracy claim against both of these individuals. In this regard, it is their basic contention that the origin of the libelous material was Calabrese and, in fact, they attempt to demonstrate in rather elaborate fashion that Calabrese must have been the source [19] because the information could not have come from anyone else. Not only is that factual premise to the conspiracy claim far-fetched and not established even for summary judgment purposes,[20] but there are also more fundamental obstacles to a survival of the conspiracy claim.

The most that could be deduced from the Drinkhall-Calabrese relationship, assuming plaintiffs' inferences in that regard to be well-founded, is that the two individuals collaborated in the sense that Calabrese provided information to Drinkhall and Drinkhall used that information as material for his article.[21] There seem to have been two purposes to that collaboration: Drinkhall was using Calabrese as a source for

what to him was an important story and Calabrese was using Drinkhall to secure a sympathetic account of his criminal past and his present confinement.

■ Collaboration between individuals with an axe to grind and reporters eager for a story is not uncommon; rather, it is the way the news media frequently operate.[22] Where this kind of collaboration occurs, the two parties could be said in one sense to be working together for the same end: publication of a story in a newspaper, or a magazine, or on radio or television. But such collaboration does not, without more, a conspiracy make, that is, an unlawful agreement which, if proved, gives rise to civil damages. An actionable agreement requires more than evidence of collaboration between two parties: there must also be an improper object or purpose. See, *e.g., International Union v. Cardwell Mfg. Co., Inc.,* 416 F.Supp. 1267, 1290 (D.Kan.1976). In the view of the Court, plaintiffs have not supplied proof of such a purpose.[23]

■ Although there is little, if any, law on this issue, the Court has concluded that proof of cooperation between two individuals who have a common purpose to produce a news story does not represent a sufficient basis for an actionable conspiracy. Their activities do not become actionable as a conspiracy merely because of one of the collaborators has a purpose to improve his image by spreading false information and the other a purpose to improve his opportu-

19. Thus, it is said that Drinkhall was lying about his confidential sources; that he did not talk to Kramer, Dowd, and Strike Force Chief Tom Kotoske until after the substance of the article was already formed; and that he misrepresented his first contacts with Calabrese which occurred earlier than Drinkhall claims they did.

20. The earliest contacts between Calabrese and Drinkhall were unlikely to have given rise to a conspiracy because many of the facts which, according to plaintiffs, Drinkhall must have obtained from Calabrese, were matters which appear to have been known to others. It is also unlikely that a reporter for a reputable newspaper would enter into a conspiracy with a mobster in federal prison at their first contact.

21. More than mere proof of opportunity is required to prove a conspiracy. See, *e.g., Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 894 (3d Cir.1981).

22. It is doubtful that the Washington press corps, for example, could survive in anything like its present size without such collaboration.

23. Where probative evidence is supplied supporting a legitimate interpretation of the conduct of the alleged conspirators, the burden is on the plaintiff to come forward with specific factual support of its allegations of conspiracy. *Mutual Funds Investors v. Putnam Management Co.,* 553 F.2d 620, 624 (9th Cir.1977).

nities for advancement by unethical practices including a reckless disregard of the truth. These purposes and the implementing actions may, to be sure, entitle the offended party to a judgment and damages for libel against each of the individuals. But with respect to a separate action for conspiracy against both, what is required in this sensitive First Amendment area [24] is proof not merely of separate and distinct improper purposes by each, proof not merely of a joint purpose to publish, but specific evidence of a joint purpose to defame.

Absent a requirement of such a purpose, the traditionally-recognized relationships between sources and reporters could become actionable as conspiracies on a substantial scale, and the inevitable result would be the "chilling" of such relationships and collaborations, to the detriment of the values inherent in the First Amendment. In the absence of law requiring such a result, the Court will not impose it here.

As stated, beyond speculation, there is here no specific evidence of such a joint Drinkhall-Calabrese purpose to defame plaintiffs,[25] and thus no evidentiary basis for a conspiracy claim.

It must also be noted that the conspiracy claim has no legitimate practical meaning in this lawsuit. Dow Jones Company, the only defendant with funds to pay a substantial judgment, is not named in that claim. Calabrese, who is named, is not likely to have the means to pay such a judgment. As for Drinkhall, it is conceded by plaintiffs that they would not be entitled to double recovery against him, that is, a recovery both on the second cause of action and on the first.[26] And proof of a conspiracy may be admitted into evidence, if otherwise relevant, whether or not it is separately charged,[27] so that plaintiffs will not be prejudiced in an evidentiary sense by a dismissal of the first cause of action. It is difficult to escape the suspicion in light of these facts that the conspiracy claim is being pressed, not for any proper litigation purpose, but in order to imply to the jury that there is a tie-in between the *Wall Street Journal* and Calabrese, a convicted mobster, and thus to prejudice the jury against the newspaper and its personnel.

The first cause of action will be dismissed.[28]

### III

The third cause of action is based on a letter written by Lawrence O'Donnell, managing editor of the *Wall Street Journal.* On April 30, 1979, Kramer wrote to O'Donnell, complaining of inaccuracies and distortions in "Ordeal at McNeil." O'Donnell responded with a point-by-point refutation of Kramer's complaints and, in the course of that refutation, he repeated several of the allegedly libelous materials that had appeared in the article. O'Donnell furnished copy of his letter to Deputy Assistant Attorney General Irwin Nathan, Kramer's superior in the Justice Department, and plaintiffs claim on that basis a republication of the libel. Defendants' summary

**24.** It may well be that outside that area, proof of such exactitude is not required.

**25.** Plaintiffs theorize that both Drinkhall and Calabrese concocted the story together with a joint purpose to defame Kramer, but this is not backed by evidence or even credible speculation as to motive, at least not on the part of Drinkhall. Two specific theories have been adduced, neither of adequate plausibility. Thus, there have been allusions to possible ties between Drinkhall and members of organized crime in addition to his ties with Calabrese, but these are on this record too remote and indefinite to sustain a claim of conspiracy, let alone a conspiracy between Drinkhall and Calabrese. It has also been suggested that Drinkhall was bribed by mobsters, but Kramer himself has acknowledged that he did not believe these suggestions.

**26.** It could be that the conspiracy claim would be subject to dismissal on that basis alone. *Willems v. Barclays Bank D.C.O.,* 263 F.Supp. 774, 776 (S.D.N.Y.1966).

**27.** See Rule 801(d)(2)(E), Fed.R.Evid.; *United States v. Ushakow,* 474 F.2d 1244 (9th Cir.1973).

**28.** Defendants' claim for attorneys' fees and costs is denied. Plaintiffs' support of the first cause of action is as legitimate as is defendants' support of those portions of their motion which are being denied.

judgment motion asserts a number of defenses to this claim,[29] but only one of these needs to be discussed in detail.

■ Plaintiffs concede that they are public officials for the purpose of determining the standard to be applied in demonstrating libel, and that under *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, (1964) they must therefore show malice, that is, knowledge of falsity or reckless disregard of the truth in order to recover.[30] The Court concludes that no reasonable jury could find on the basis of the evidence that O'Donnell published the statements in his letter with malice within the meaning of the *Sullivan* rule.

Plaintiffs have the burden of proving malice with "convincing clarity,"[31] and summary judgment against them is appropriate if they fail to produce evidence from which a jury could find malice by clear and convincing proof.[32] There is no evidence that O'Donnell knew that the facts in his letter were false, and he therefore could be held liable, if at all, only on the basis that

he acted with reckless disregard of the truth. With respect to that standard, plaintiffs have the burden of showing that the defendant "entertained serious doubts as to the truth of [the] publication,"[33] or possessed a "high degree of awareness of ... probable falsity."[34]

Plaintiffs attempt to discharge this heavy burden in the following manner. In their view, O'Donnell should have been on notice of the possible falsity of "Ordeal of McNeil" because of Kramer's denial of the quotations attributed to him, doubts that the Justice Department had expressed about the accuracy of the article, and a prior complaint regarding Drinkhall's reporting on another story.[35] In the opinion of the Court, these facts,—even assuming that they are facts[36]—are insufficient to establish malice when they are considered in conjunction with the undisputed evidence concerning O'Donnell's state of mind.

When O'Donnell received the Kramer letter, he had no personal knowledge at all of the facts.[37] In addition to consulting with

---

**29.** Defendants claim, *inter alia,* that the letter was conditionally privileged as reasonably necessary to protect O'Donnell's own interest (*Buckley v. Vidal,* 327 F.Supp. 1051 (S.D.N.Y.1971)); to protect the. interests of Nathan and of the Department of Justice (Restatement (Second) of Torts, § 595); *Brown v. Collins,* 402 F.2d 209 (D.C.Cir.1968)); and to protect the public interest (Restatement (Second) of Torts, § 598; *Rollenhagen v. City of Orange,* 116 Cal.App.3d 414, 172 Cal.Rptr. 49 (1981)). It is also claimed that the letter was not "of and concerning" Dowd. Restatement, Torts § 563, Comment f (1938).

**30.** Memorandum at 55–56 n. 14. Some courts have stated that this means more than gross negligence but intentional disregard of the truth. *Reliance Insurance Co. v. Barron's,* 442 F.Supp. 1341, 1349–50 (S.D.N.Y.1977). The D.C. Court of Appeals has phrased the bad faith test in terms of "the doing of an action without just cause or excuse, with such conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute illwill." *Ford Motor Co. v. Holland,* 367 A.2d 1311, 1314 (D.C.App.1977).

**31.** *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974).

**32.** *Nader v. de Toledano,* 408 A.2d 31, 49 (D.C.Ct. App.1979); see also, *Washington Post v. Keogh,* 365 F.2d 965 (D.C.Cir.1966); *Alfred A. Altimont*

*Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 290 (D.C.Ct.App.1977).

**33.** *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

**34.** *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964).

**35.** Plaintiffs also rely on settlements of two libel actions against Drinkhall prior to his *Wall Street Journal* employment, but O'Donnell has testified that he was unaware of those actions and their settlements.

**36.** At least some of these matters are disputed.

**37.** O'Donnell was made aware of the facts in and surrounding the article by Robert D. Sack, his attorney. This Court has previously ruled that, because of attorney-client privilege, plaintiffs could not depose Sack. In view of the information Sack provided to O'Donnell in preparation of the letter, plaintiffs have moved that the Court reconsider that ruling. That motion will be denied. There was an express understanding between the parties that O'Donnell's testimony would not constitute a waiver of the attorney-client privilege, and that understanding still stands. In any event, the finding of lack of malice on the part of O'Donnell does not depend upon the Sack advice but is a product of circum-

his attorney (see note 37 *supra*) he therefore asked the Acting Assistant Bureau Chief in San Francisco to review Drinkhall's notes to verify that they accurately reflected what the article had reported, and he received a positive reply. O'Donnell himself also reviewed the notes, and the letter is principally a summary taken from these notes. Moreover, O'Donnell knew that the Drinkhall article had been considered and edited both in San Francisco and in Washington by competent, experienced editors. Finally, O'Donnell has testified to his subjective belief that the letter is true, and Kramer has not been able to refute that claim.

What Kramer's argument in essence asks is that, when the object of a story denies the facts and there are other indications of possible inaccuracies, an editor may be held to have acted with malice if he fails to disavow his reporter—even when that reporter continues to insist that the story is accurate and he has notes which back his claim, at least in substantial part. That is neither the law nor good public policy.

■ Absent far more obvious reasons to doubt the veracity of an article than were present here, an editor may reasonably rely upon the trustworthiness and integrity of his reporters without being held to have acted with malice.[38] In fact, absent special circumstances, even a failure to investigate does not establish a reckless disregard for the truth.[39] This does not mean, of course, that a newspaper or its editor may blindly

"stand behind" its story or its reporter irrespective of substantial indications of falsity. But that is not this case.

The claims of general or specific reportorial inaccuracy brought to O'Donnell's attention were not so substantial that they would have been convincing to a reasonable editor. That being so, there is no basis for subjecting O'Donnell to a trial on account of his letter on the theory of actual malice merely because he continued to support his reporter in the face of these claims. We do not yet know what a jury will decide with respect to Drinkhall's credibility; but O'Donnell cannot be held to have acted with malice because conceivably—after years of pretrial discovery, and following examination and cross examination in a trial—a jury may decide that plaintiffs are right about Drinkhall.

The Court's finding of an absence of malice is further buttressed by the fact that O'Donnell did not publish his letter indiscriminately but sent a copy only to Irwin Nathan, Kramer's superior.[40] There was, moreover, a reasonable basis for that limited publication. O'Donnell believed, and he had grounds for believing, that Nathan helped draft Kramer's original letter and that he expected a copy of the reply.[41]

The third cause of action will be dismissed.

## IV

On August 7, 1979, the day after the Department of Justice released a report of its own investigation of the allegations con-

---

stances discussed below, and there is for that reason no basis for reconsidering the prior ruling.

**38.** See *Hotchner v. Castillo-Puche*, 551 F.2d 910 (2d Cir.1977); *Washington Post Co. v. Keogh*, 365 F.2d 965, 971–72 (D.C.Cir.1966); *Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 435 N.Y. S.2d 556, 416 N.E.2d 557 (1980).

**39.** *Gertz v. Robert Welch, Inc., supra; St. Amant v. Thompson, supra; Liberty Lobby, Inc. v. Anderson*, 562 F.Supp. 201, 208 (D.D.C.1983).

**40.** At the time Nathan was seeking the cooperation of the *Wall Street Journal* in its investigation of the allegations contained in "Ordeal at McNeil."

**41.** Kramer's draft was reviewed by his immediate superior Thomas Kotoske, and it was then sent on to be reviewed by Nathan and another supervisor. Kramer was also told that, while it was his letter, "we want to see it." Although Kramer has stated that he did not give permission for Nathan to receive a copy of O'Donnell's reply, he has also indicated that he would not have objected to the receipt of a copy by others in the Department of Justice. Cf. *McKinney v. County of Santa Clara*, 110 Cal.App.3d 787, 796, 168 Cal.Rptr. 89, 93 (1st Dist.1980); *Church of Scientology of California, Inc. v. Green*, 354 F.Supp. 800, 803–04 (S.D.N.Y.1973).

tained in "Ordeal at McNeil," the *Wall Street Journal* published an article in which it described and commented on that report. Plaintiffs claim in their fourth cause of action that this article constitutes a republication of the defamation and is therefore actionable.[42] Defendants' motion for summary judgment is predicated on the proposition that the factual portions of the article about which plaintiffs complain are accurate accounts of the official Justice Department report and that the final sentence—a comment from Laurence G. O'Donnell to the effect that "[w]e haven't found anything since the article ran that makes us think that what we printed was in error"—is a protected statement of opinion.

 Fair and accurate accounts of official reports or records are absolutely protected from defamation actions. Restatement (Second) of Torts, § 611; *Dameron v. Washington Magazine*, 575 F.Supp. 1575 (D.D.C.1983); *Kilgore v. Younger*, 30 Cal.3d 770, 180 Cal.Rptr. 657, 640 P.2d 793 (1982). Thus, the survival of the fourth cause of action depends upon a determination whether the August 7, 1979 article was a fair and accurate account of the Justice Department report. Having reviewed the article in detail, the Court concludes that it would be unreasonable for a jury to find that the article was not a fair and accurate account of that report, and the Court will therefore grant defendants' motion for summary judgment with respect to this claim.

The article is an entirely neutral account of the Justice Department's findings.[43] From the headline on, it gives primary em-

---

**42.** *Dixson v. Newsweek, Inc.*, 562 F.2d 626 (10th Cir.1977); Restatement (Second) of Torts § 581.

**43.** The article reads in its entirety as follows, with the allegedly defamatory portions underlined:

U.S. SAYS IT FINDS NO EVIDENCE OF ABUSES IN THE OBTAINING OF PRISONER'S TESTIMONY

By a WALL STREET JOURNAL Staff Reporter

WASHINGTON—The Justice Department said it hasn't found any evidence that federal prosecutors used abusive tactics to gain testimony from Samuel Ray Calabrese, a federal prisoner held at McNeil Island, Wash.

The department conducted a two-month investigation of the matter following publication of an article in The Wall Street Journal last April that made what the department called "serious allegations of prosecutorial abuse."

The article quoted Michael Kramer, an attorney with the department's Organized Crime Strike Force in San Francisco, discussing aspects of what the article termed a *"planned campaign" to persuade Calabrese to provide evidence about others suspected of organized-crime activity.*

In a report summarizing an investigation by Justice Department Attorney Alfred Hantman the department said it hadn't found any "evidence that the campaign of harassment described in the (Wall Street Journal) article was either planned or implemented."

The department said, specifically, that its investigation found that federal prosecutors hadn't made any "effort to influence Calabrese's housing placement at McNeil, that Calabrese hadn't been attacked or hospitalized while at McNeil and that Calabrese hadn't been subject to harsh or unusual treatment while at McNeil." The article described *rumors that such mistreatment had taken place and was part of the prosecutors' effort to pressure Calabrese to provide evidence.*

The article said *other elements of the alleged plan included indicting Calabrese on charges that had previously been dropped; giving him immunity from prosecution before two grand juries so he would face contempt orders and further jail time if he refused to testify; undermining the financial support of Calabrese's family by encouraging tax action by the Internal Revenue Service and pressuring one of Calabrese's former associates.*

The Justice Department said it didn't find any "indication that any steps have been taken to carry out any of the various tactics ascribed to Kramer to that use of such tactics was actually contemplated by Kramer." The department added that its procedures regarding such matters as initiation of prosecutions and grants of immunity to witnesses "provide significant protections against a number of the abusive practices outlined in the article."

In addition to quoting Mr. Kramer, the article quoted John Dowd, a former Justice Department prosecutor who has since moved to private practice here. Mr. Dowd, the article said, "agrees completely with what Mr. Kramer plans to do." The Justice department said Mr. Kramer and Mr. Dowd "deny making many of the statements attributed to them in the article." But the report didn't attempt to resolve whether the two men actually made the statements.

phasis to the fact that the Department of Justice exonerated Kramer and Dowd in all respects and that it found fault with the accuracy of the *Wall Street Journal*'s article. Five of the ten paragraphs are to this precise effect, and they include such statements as that the "Justice Department said it hasn't found any evidence that federal prosecutors used abusive tactics"; that the report had found no evidence that the "campaign of harassment described in the article was either planned or implemented"; that the investigation had found that federal prosecutors hadn't "made any effort to influence Calabrese's housing placement" or that Calabrese had been attacked, hospitalized, or subjected to harsh or unusual treatment while at McNeil; that no indication had been found that Kramer had taken or contemplated steps against Calabrese; and that Kramer and Dowd "deny making many of the statements attributed to them in the article."

To be sure, the article does repeat from both the *Wall Street Journal*'s earlier article and from the Department of Justice's report some of the charges made against plaintiffs. But these references are minimal, they are presented in a non-sensational light, and they do no more than to provide the context for the description of the exonerating portions of the Justice Department report. By no stretch of the imagination can these relatively modest references be described as a "concise restatement of virtually all the libelous material plaintiffs

complained of in 'Ordeal at McNeil,' " [44] and they can certainly not be regarded as having been published with malice.[45]

Finally, as concerns the O'Donnell quote, it does not transform the otherwise fair and accurate article into a libelous one. It is not necessary for the Court to decide whether or not that quote is opinion.[46] Even if it is not, it represents in the context of an otherwise unexceptional article a fair comment with respect to an ongoing controversy.[47]

The fourth cause of action will be dismissed.

## V

■ On December 12, 1979, the *Wall Street Journal* published a second major article concerning the plaintiffs. This article, entitled "A Reporter's Tale," was also written by Drinkhall. In addition to repeating portions of "Ordeal at McNeil," the new article went on to describe an investigation of Drinkhall by Kramer. For purposes of the motion for summary judgment, this article may be considered as being constituted of three parts—a repetition of portions of "Ordeal at McNeil," a description of the Kramer investigation, and the lead and concluding paragraphs.

First. Like the August 7, 1979 article discussed in Part IV *supra*, the December 12, 1979 article refers back to and repeats the substance of portions of "Ordeal at McNeil." Defendants claim that, here, too,

---

Since the article was published last April 11, Calabrese has sued Attorney General Griffin Bell and Mr. Kramer in U.S. district court in Las Vegas. The civil suit involves some of the allegations made in the Journal's article.

Commenting on the Justice Department report, Laurence G. O'Donnell, managing editor of the Journal, said, *"We haven't found anything since the article ran that makes us think what we printed was in error."*

**44.** Plaintiffs' Memorandum at 61 n. 17. In an effort to buttress their position, plaintiffs assert that the article did not reveal that defendants had declined to cooperate in the Department of Justice investigation. It is not entirely clear whether that omission helped or harmed plaintiffs, but in any event they cannot legitimately complain about what the *Wall Street Journal* did

not say, particularly when what was omitted was by no means critical either to an understanding of the story or to its fairness.

**45.** Restatement (Second) of Torts, § 611; Conklin v. Sloss, 86 Cal.App.3d 241, 246, 150 Cal.Rptr. 121, 125 n. 1 (3d Dist.1978).

**46.** If it is opinion, the statement is not actionable. *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 339, 94 S.Ct. at 3006; *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781, 783–84 (9th Cir.1980).

**47.** See *Good Government Group v. Superior Court,* 22 Cal.3d 672, 150 Cal.Rptr. 258, 261, 586 P.2d 572, 575 (1978); *Information Control Corp. v. Genesis One Computer Corp., supra,* 611 F.2d at 784.

the references to the first article are included solely for the purpose of giving the reader the necessary context for the new material, and they assert that the summary of the earlier article is "no more than a neutral reportage necessary to an understanding of a subsequent, indisputably newsworthy event." [48]

A simple perusal of the article demonstrates, however, that that is not so. If a jury could find that "Ordeal at McNeil" is false and malicious—a point defendants have conceded by their failure to move for summary judgment with respect to that article [49]—then that jury could make the same finding with respect to those portions of "A Reporter's Tale" which republish the earlier report of plaintiffs' alleged persecution of Calabrese. A few paragraphs from "A Reporter's Tale" will provide the flavor of the article in that regard:

> Last April 11, I reported in the Journal that members of the Justice Department and in particular Michael Kramer, an attorney with the department's Organized Crime Strike Force here, were boasting that they were using a variety of questionable tactics to force Samuel Ray Calabrese, an associate of organized-crime figures, to talk.

> The story said that, according to the prosecutors, the federal strike force had begun a campaign to force Calabrese to give them information about one of the government's most elusive targets, Las Vegas casino owner Morris Shenker. Calabrese is in the federal penitentiary in Lompoc, Calif., on two fraud convictions with sentences totalling 14 years.

> The article reported that government prosecutors said they connived to raise not only the specter of new charges, more prison time and destruction of his family's income, but also the threat of bodily harm by putting out the word on the prison grapevine that Calabrese was a police informant.

> The story quoted Mr. Kramer extensively. "We're going to get Sam to give us Shenker or we're going to bury him." Mr. Kramer was quoted as saying. The story said that, among other things, the government would try to get prison officials to put Calabrese in solitary confinement. "Plus, we'll leak word that he's cooperting. The bad guys know how to deal with that," Mr. Kramer was quoted as saying.

> \* \* \* \* \* \*

> After that story was printed, things began happening:

> The Justice Department began a two-month investigation into the alleged prosecutorial abuses. That investigation "disclosed no evidence that the campaign of harassment described in the Drinkhall article was either planned or implemented," according to its report.

> But the investigation didn't "discuss or attempt to resolve whether Drinkhall and The Wall Street Journal accurately reported statements of Michael Kramer and John Dowd (former head of Washington, D.C. based Strike Force 18 and now in private practice). Kramer and Dowd acknowledge speaking with Drinkhall but deny making many of the statements attributed to them in the article," the report said.

> \* \* \* \* \* \*

> Even when the Justice Department issued its report exonerating its lawyers, it was clear that some in the government weren't through with me.

That this kind of republication of the original allegedly defamatory material is not necessary to a balanced news story regarding this subject matter is shown most vividly by the August 7, 1979 article. The author of that story—not Drinkhall—demonstrated that it is perfectly possible to report on this controversy without indulging in a deliberate, lengthy repetition of the alleged libels. Even if it be assumed that

---

**48.** Memorandum at 108.

**49.** Except with respect to the unrelated matter of the California retraction statute. See Part I *supra.*

somewhat more extensive reference to the "Ordeal at McNeil" facts was permissible to provide the contextual nexus here than was necessary in the August 9, 1979 story, it is still clear that a jury could reasonably conclude that Drinkhall and the *Wall Street Journal* set out in "A Reporter's Tale" to publish again, with emphasis and actual malice, the allegedly offensive material from "Ordeal at McNeil." [50] To be sure, a jury could also find that there was no malice or that Kramer and Dowd were substantially guilty of the charges levelled against them both articles. The choice is not the Court's. All that needs to be decided at this time is whether a genuine issue of material fact exists with respect to this part of the controversy,[51] and the answer must clearly be in the affirmative.[52]

Second. Upon the groundwork of a repetition of the charge that plaintiffs misused their authority by improperly harassing Calabrese, "A Reporter's Tale" goes on to describe how these same plaintiffs allegedly went on also to harass Drinkhall. The "sting" of that part of the article is that

50. If defendants can be deemed to have had a "high degree of awareness of ... probable falsity" (*Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.E.2d 125 (1964)) of "Ordeal at McNeil," *a fortiori* they had such awareness when they republished the same charges eight months later, following their dispute with plaintiffs.

51. If only because of this portion of the article, the Court holds that "A Reporter's Tale" does not relate only to Kramer but is also "of and concerning" Dowd. See *Fetler v. Houghton-Mifflin,* 364 F.2d 650, 651 (2nd Cir.1966). The first article is conceded by defendants to refer to both plaintiffs. Republication of the material, especially in view of the references to "members" of the Justice Department and to "federal prosecutors," a reader would reasonably believe that the article referred also to Dowd. *Geisler v. Petrocelli,* 616 F.2d 636, 639–40 (2nd Cir.1980). At a minimum, this is a matter for the jury to decide. *Id.* A jury could also reasonably conclude that the allegedly improper Kramer investigation of Drinkhall was carried on also on behalf of Dowd.

52. Defendants' reliance on the record privilege is likewise misplaced, for the article is or could reasonably be found to be not a fair and neutral reportage of statements made by others but a deliberate republication of the *Wall Street Jour-*

Kramer spoke to prosecutors, journalists, and others about Drinkhall in the course of wide-ranging campaign of misuse of his prosecutorial authority to punish Drinkhall for having written the first article.[53] Yet it is reasonably possible to draw an entirely different inference from the evidence concerning Kramer's activities: that he was making inquiries in the course of a legitimate effort to gather data which would enable him to respond to the Drinkhall charges by way of a defamation action [54] or in connection with the various Justice Department inquiries which those charges had generated.

It is simply not "indisputably true," as defendants assert, that Kramer abused his power as a prosecutor by these activities;[55] that is sharply contested, and properly so. A jury could find that Kramer's investigation was legitimate,[56] and such a finding would in this context necessarily defeat defendants' theory of the non-defamatory nature of "A Reporter's Tale."

Third. "A Reporter's Tale" begins with this paragraph:

> *nal's* earlier charges. See *Cianci v. New York Times Publishing Co.,* 639 F.2d 54, 68 (2nd Cir. 1980). These charges did not become effectively "laundered" and fit for republication without fear of libel action merely because the Department of Justice included them in a report designed to determine whether they had substance.

53. This was done, it is said, by spreading the rumor that Drinkhall "had been reached by the mob and that he had taken a payoff for doing the Calabrese story." Defendants' memorandum at 83.

54. Calabrese had already filed a lawsuit against Kramer.

55. Reply Memorandum at 89.

56. Defendants point to criticism by various Justice Department officials of Kramer's investigation in support of their view that the investigation could not have been legitimate. But these criticisms were not nearly as firm or as unanimous as defendants assert. In any event, the reaction of these officials, while it might constitute admissible evidence, is not the equivalent of a conclusive determination of the lack of legitimacy of plaintiffs' efforts—that is very much a jury issue.

A funny thing happened to me after I wrote a story for the Wall Street Journal: The Justice Department, or at least a U.S. prosecutor, set out to prove that I took a bribe from the mob to do the story.[57]

And the conclusion of the article states:

Ten years of reporting about organized crime have reconciled me to the majority view of my little group that mob revenge against crime writers mostly is myth harmlessly propagated by cocktail conversation.

But I'm less convinced, after this experience, that the odds are as good against retribution by the federal government.

Defendants claim initially that these statements set forth the "undisputed truth." [58] That claim, too, must fail at this stage, for it is, once again, hotly disputed whether Kramer "set out to prove that [Drinkhall] took a bribe from the mob to do the story," or that the "federal government," *i.e.*, these plaintiffs, was indulging in "revenge" or "retribution."

▆▆ Defendants argue next that these same statements are not actionable as a matter of law because they constitute constitutionally protected opinion. The parties are agreed that it is ordinarily a question of law for the Court whether an allegedly defamatory statement is a statement of opinion or fact. *Information Control v. Genesis One Computer Corp., supra,* 611 F.2d at 783; *Gregory v. McDonnell,* 17 Cal.3d 596, 131 Cal.Rptr. 641, 644, 552 P.2d 425, 428 (1976); *Lewis v. Time, Inc.,* 710 F.2d 549, 553 (9th Cir.1983). They are also agreed that, in making the determination whether fact or opinion is stated, the con-

text of the statement is important. *Good Government Group of Seal Beach, Inc. v. Superior Court, supra,* 586 P.2d at 575, 22 Cal.3d 672, 150 Cal.Rptr. at 261; *Gregory v. McDonnell Douglas, supra,* 552 P.2d at 428, 17 Cal.3d 596, 131 Cal.Rptr. at 644.

Defendants assert that the lead, the headline, and the final paragraphs do no more than to summarize their *opinion* about what plaintiffs were doing. In the view of this Court, that it is an entirely incorrect description of these parts of the article. The statements in these portions constitute summaries of the *facts* stated or implied through the remainder of the article—that Kramer was improperly investigating Drinkhall in retribution for the first article and that he was maliciously circulating his view that Drinkhall had taken a bribe.[59]

The Court concludes that the truth or falsity of "A Reporter's Tale" [60] and the question of malice with respect thereto, are matters for the jury.

The motion for summary judgment will be denied with respect to the fifth cause of action.

## VI

Following the publication of the several articles at issue and Kramer's investigation of Drinkhall, the latter brought his own action against Kramer. In that action, he charges, among other things, that Kramer unlawfully invaded his privacy and deprived him of his constitutional rights under color of law. Presently before the Court are Kramer's motion for summary judgment and Drinkhall's motion for par-

---

**57.** The headline is in a similar vein: "Official Apparently Attempts to Prove that Journalist Took a Payoff to Do a Story."

**58.** Reply Memorandum at 92.

**59.** See also, *Cianci v. New York Times Publishing Co., supra,* 639 F.2d at 61–67.

**60.** It is appropriate for the Court and the jury to consider the article in its entirety, rather than

on a paragraph-by-paragraph or sentence-by-sentence basis. See *Afro-American Publishing Co. v. Jaffe,* 366 F.2d 649, 655 (D.C.Cir.1966); *Hoffman v. Washington Post Co.,* 433 F.Supp. 600, 602 (D.D.C.1977), *aff'd,* 578 F.2d 442 (D.C.Cir.1978). Particular portions of an article might be removed from jury consideration on specific grounds such as privilege, but no such excision is reasonably possible here at this juncture.

tial summary judgment with respect to liability on two of his claims.[61]

### A. *The Kramer Motion*

The Kramer summary judgment motion relies on various privileges, on immunity, and on lack of injury to Drinkhall as defenses to the Drinkhall lawsuit.

 First. Kramer cites a number of privileges as immunizing him absolutely or conditionally from this action, including the privilege to protect his own reputation from defamation, to protect the interest of Dowd, and to protect the interest of the public. None of these privileges constitutes a defense either to a privacy action or to an action for deprivation of constitutional rights; they are defenses only to defamation suits. Since Drinkhall is not requesting summary judgment on his various defamation claims (see note 61 *supra*), these privileges are irrelevant as defenses at this time.[62]

 Kramer also relies on the litigation privilege embodied in section 47(2) of the California Civil Code which protects publications made in judicial proceedings, among others. However, otherwise actionable communications to third parties become privileged under California law only if they have some connection or logical relation to such a proceeding. *Bradley v. Hartford Accident and Indemnity Co.*, 30 Cal.App.3d 818, 106 Cal.Rptr. 718 (1st Dist. 1973). No case has extended the privilege to statements made in the course of the kind of investigation conducted by Kramer.

 Second. Kramer relies next on qualified official immunity, arguing that his investigative activities were conducted in the scope of his official employment. See *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). However, a government officer is not entitled to immunity if his actions are "manifestly and palpably beyond his authority." *Butz v. Economou*, 438 U.S. 478, 493 n. 18, 98 S.Ct. 2894, 2904 n. 18, 57 L.Ed.2d 895 (1978). Generally, this is now determined as a matter of law by means of an objective standard.[63] Whatever the test, a jury could find that Kramer was investigating Drinkhall for his own private ends rather than the ends of the government, and it could also find that these actions were a gross abuse of authority. Thus, summary judgment on immunity grounds in favor of Kramer is not appropriate. On the other hand, the immunity issues are so intertwined with the factual disputes underlying the Drinkhall lawsuit[64] that a decision at this time on the immunity question as a matter of law in favor of Drinkhall would likewise be improper.[65]

 Third. Kramer contends that Drinkhall suffered no injury as a result of the investigation, and that he cannot recover for that reason alone. However, not only has Drinkhall made a claim of injury,[66] but even if he were unable to demonstrate

---

**61.** Drinkhall is not requesting summary judgment on other claims (*i.e.,* libel, slander, and "false light" privacy) encompassed in his lawsuit.

**62.** To be sure, Kramer is asking for summary judgment in his favor on the entire case, but he cannot prevail with respect to his defamation claims unless there is an absence of malice. That, however, is a factual matter which on this record cannot be resolved on summary judgment.

**63.** *Harlow v. Fitzgerald, supra,* 457 U.S. at 818, 102 S.Ct. at 2738; *Ellsberg v. Mitchell,* 709 F.2d 51, 69 (D.C.Cir.1983).

**64.** If the jury found, for example, that Kramer's investigation of Drinkhall had as its purpose the

mere gathering of information in a neutral fashion, Kramer could not be found to have acted beyond his authority and, if he were not otherwise exonerated, his actions would be shielded by official immunity.

**65.** There is also a question whether a reasonable person in Kramer's situation would have known that he was violating the law. See *Harlow v. Fitzgerald, supra,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39; *Gray v. Bell,* 712 F.2d 490, 496 (D.C. Cir.1983).

**66.** Drinkhall asserts that he was humiliated and embarrassed and that he has lost some of his government sources as a result of the Kramer investigation. Since Drinkhall seeks judgment at this time only on liability, consideration of the precise damage suffered is premature.

specific injury, he would still be entitled to a judgment upon proof of deprivation of his First Amendment rights, although the damages might be nominal only. See *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978); *Herrera v. Valentine*, 653 F.2d 1220, 1227–29 (8th Cir. 1981); *Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir.1980); *Dellums v. Powell*, 566 F.2d 167, 195–96 (D.C.Cir. 1977).

Fourth. Underlying much of Kramer's argument is the notion that, inasmuch as Drinkhall had wronged him in various ways, he had the right to use what means he had to retaliate. Specifically, Kramer argues that the Drinkhall motion and memorandum "totally ignore [the] enormous provocation" stemming from the authorship by Drinkhall of a defamatory article.[67] Moreover, Kramer further suggests that, in contacting various individuals in the course of his investigation of Drinkhall he did no more than what Drinkhall did in *his* investigation of Kramer.

 However, as counsel for Drinkhall correctly points out, there is a fundamental difference in status between Kramer and Drinkhall: because of his affiliation with the government, the former was capable under the Constitution of acting under color of law, the latter, a private citizen, was not.[68] Kramer may therefore be sued for deprivation of the constitutional rights [69] even if some or all of his actions were, but for his government affiliation, comparable

to Drinkhall's. It also follows that, if Kramer was provoked by Drinkhall's actions, his appropriate remedy was the one he ultimately chose—a libel action; he could not lawfully use the power of his office to retaliate.[70]

For these reasons, the Court will deny Kramer's motion for summary judgment on the Drinkhall suit.

### B. *The Drinkhall Motion*

Drinkhall's motion proceeds on the following rationale. With respect to the action for deprivation of constitutional rights, he relies upon an "abuse of [Kramer's] investigative powers in an attempt to chill the exercise of basic [First Amendment] rights in their most pristine and classic form,"[71] and on the privacy claim, he contends that he was subjected to an "unreasonable intrusion upon [his] seclusion."[72]

 The summary judgment motion on the deprivation of constitutional rights claim can succeed only if it is adequately established (1) that Kramer made use of his official position, (2) that what he did was improper, and (3) that he violated Drinkhall's First Amendment rights. However, there are genuine issues of fact with respect to each of these elements.[73]

First. Drinkhall argues that it is clear beyond doubt that Kramer conducted his investigation of Drinkhall in his official capacity. Although there is considerable evidence to support that claim,[74] there is also

---

**67.** Memorandum at 7.

**68.** However unrealistic it may be to treat Kramer, a middle-level bureaucrat under a cloud with his supervisors, as possessed of enormous power whose actions must therefore be tightly circumscribed, while the *Wall Street Journal*, with its daily readership of two million persons, is equated with the criminal defendants and prisoners who are the usual targets of deprivations under color of law, that is the constitutional mandate.

**69.** *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); *Hanson v. Hoffmann*, 628 F.2d 42, 52–53 (D.C.Cir.1980); and *Paton v. La Prade*, 524 F.2d 862 (3d Cir.1975).

**70.** As discussed below, it is a disputed question of fact whether that is what Kramer did.

**71.** Memorandum at 54.

**72.** Memorandum at 62.

**73.** Even if there were a genuine dispute only as to one of these issues, it would be as to a material fact and it would therefore preclude the grant of summary judgment.

**74.** For example, Kramer made use of an FBI agent to secure data, and he telephoned various Justice Department employees to obtain information which presumably they might not have furnished to the general public.

evidence from which a reasonable jury could make a contrary finding. For example, Drinkhall makes much of the fact that Kramer wrote several letters on Justice Department Strike Force stationery in the course of his investigation. Yet when those letters are examined, it becomes apparent that they informed the recipients in one way or another that Kramer was acting in his private capaicty, without the weight of his Office behind whatever requests were made. Similarly, although Kramer did not affirmatively advise individuals whom he telephoned that he was not acting in an official capacity, he did not state that he was, and he freely acknowledged his private interest whenever he was asked about the capacity in which he was calling. In short, this is an issue of fact appropriately left to the jury.[75]

Second. Drinkhall asserts that Kramer mounted an unauthorized investigation for the purpose of harassing him and depriving him of his rights. A substantial amount of evidence is adduced in support of that claim,[76] and it may well be that a jury will ultimately believe that that is what Kramer was engaged in doing. Yet there is also evidence which, if believed, could lead a jury to conclude that Kramer was engaged only in an entirely lawful attempt to gather information[77] which would assist in the defense of his conduct in possible defama-

tion litigation, with respect to inquiries made of him within the Department of Justice, or both.[78]

Third. The motion postulates that Kramer's activities, assuming that they were otherwise improper, violated Drinkhall's First Amendment rights. That conclusion, too, is not self-evident: Drinkhall has the burden of showing that there is no genuine issue of fact with respect to that element of the tort. An infringement of First Amendment rights cannot be assumed merely because Drinkhall is a journalist.[79] Yet it is at present not at all clear in what other way Drinkhall's First Amendment rights were invaded.[80] It may be that a trial will give greater content to his claims in that regard,[81] but at this juncture the facts are sufficiently ambiguous and disputed as to preclude grant of summary judgment on that basis as well.

The Drinkhall action for invasion of privacy under California law[82] also raises substantial factual issues.

 Drinkhall recognizes, as he must, that only *unreasonable* intrusions upon his seclusion are actionable. See Restatement (Second) of Torts § 652B; *White v. Davis*, 533 P.2d 222, 234, 13 Cal.3d 757, 120 Cal. Rptr. 94, 106 (1975). As stated above, there is a substantial dispute whether

**75.** Nevertheless, Kramer could be found to have acted under color of law even if what he did was unauthorized.

**76.** However, it is entirely incorrect to say—as Drinkhall does in his brief—that the motion should be granted because it "is predicated upon Kramer's own sworn testimonial admissions." Memorandum at 2. In fact, that brief goes on for almost forty pages to cite to evidence, some of it disputed, from well over a dozen other persons.

**77.** Kramer's activities were limited to the gathering of information.

**78.** Many of the individuals whom Kramer contacted, including FBI agents, prison officials, and prosecutors, were the same persons to whom Drinkhall had spoken in the course of his preparation of "Ordeal at McNeil." To be sure, as noted above, the Constitution sets a standard for Kramer that it does not set for Drinkhall. Yet the two men are alike in one respect: it is

possible, on this record, to conclude that either or both were engaged in activities which were reasonable and therefore not actionable.

**79.** *Reporters Committee v. AT & T*, 593 F.2d 1030, 1051 (D.C.Cir.1978); *Tavoulareas v. Washington Post Co.*, 724 F.2d 1010 (D.C.Cir.1984) (at 1025–1026).

**80.** Drinkhall has declined to claim that the invasion of his rights consisted of retaliatory action. See Transcript of Proceedings at 151–53. There is mention in Drinkhall's brief of suppression of critical speech (Memorandum at 56), but it is nowhere explained how Kramer suppressed Drinkhall's speech.

**81.** This is not the injury issue discussed at p. 1222–23 *supra*; rather, it goes to the very existence of Drinkhall's cause of action.

**82.** See *H & M Associates v. El Centro*, 109 Cal. App.3d 399, 411, 167 Cal.Rptr. 392, 400 (1980).

Kramer's investigative activities were unreasonable and unlawful or whether they constituted legitimate activities in defense of legitimate interests.

Moreover, with respect to the privacy claim, the "color of law" element which is significant to the resolution of the deprivation of rights claim is entirely, or at least largely, absent. One consequence of that changed posture is that the actions of the two protagonists are measured with respect to this issue by essentially the same standard. A jury might well conclude, therefore, that Kramer's instrusion upon Drinkhall's seclusion was justified both because Drinkhall provoked the intrusion and because in the course of his own investigation he revealed the information that Kramer was seeking. Such conclusions would defeat the Drinkhall action even though they might not defeat the claim of deprivation of rights under color of law.[83]

Drinkhall's motion for summary judgment will therefore likewise be denied.

## VII

The first, third, and fourth causes of action in the Kramer-Dowd complaint will be dismissed, but defendants' summary judgment motion will be denied with respect to the remainder of the complaint. The Court also denies both motions for summary judgment in the Drinkhall suit against Kramer. Left for trial, therefore, are the second and fifth causes of action stated in the Kramer-Dowd complaint, the Drinkhall claims against Kramer, and the Kramer-Dowd action against Calabrese. The trial of these claims will begin June 18, 1984. Orders regarding pretrial briefing, a pretrial conference, and the remaining disputed matters are being issued contemporaneously herewith.

**83.** See *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 307 N.Y.S.2d 647, 255 N.E.2d 765 (1970). The Court rejects Drinkhall's effort to distinguish *Nader* on the basis that there the defendant was General Motors while here the alleged culprit is an agent of the government. Tran-

script of proceedings at 126–27. Drinkhall has not cited authority for the proposition that this difference in status is decisive in the context of a privacy claim (whatever might be the rule in a case involving deprivations of constitutional rights).